168 N.J. Super. 466 (1979)
403 A.2d 500
PEGGY McINTOSH, ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF KIMBERLY A. McINTOSH, DECEASED, PLAINTIFF,
v.
MICHAEL MILANO, M.D., DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided June 12, 1979.
*470 Mr. James P. Patuto for plaintiff (Messrs. Gallantucci & Patuto, attorneys).
Mr. Robert J. McKenna for defendant (Messrs. Shanley & Fisher, attorneys; Mr. McKenna and Mr. Richard E. Brennan on the brief).
PETRELLA, J.S.C.
Defendant Michael Milano, M.D., a board-certified psychiatrist licensed to practice in New Jersey, seeks summary judgment dismissing the complaint in this wrongful death action on the ground that he owed no duty to plaintiff's decedent and daughter, Kimberly McIntosh (sometimes referred to as decedent). On July 8, 1975 Lee Morgenstein, who by then had been a patient of defendant for slightly more than two years, murdered decedent.[1]
There are few reported cases on the liability of therapists, including psychiatrists, for failure to warn third parties or potential victims of danger or threats of potential harm by persons for whom they render treatment or therapy. No reported New Jersey case has been found which discusses the allegations plaintiff here asserts against defendant psychiatrist. Plaintiff places reliance in her claim of duty and *471 breach thereof on the case of Tarasoff v. Regents of Univ. of California, 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (Sup. Ct. 1976) (Tarasoff II),[2] which is nonbinding authority in this jurisdiction.
Defendant argues that no such duty exists in this State, and that this court should not create one or allow one to be asserted by plaintiff by adopting the Tarasoff II rule or one comparable thereto.
The parties have fully briefed this matter. They refer to depositions filed with the court, certain affidavits filed in connection with this matter, the report of plaintiff's expert psychiatrist which asserts that defendant committed a "gross deviation" from accepted medical practice, and the report of the defendant himself to the Bergen County Prosecutor (with certain handwritten changes and additions thereon) in connection with Morgenstein's criminal trial. The court also had the benefit of the criminal trial testimony of defendant Milano, when he testified in support of Lee Morgenstein's defense (a transcript of which was provided and made a part of this motion by the court). Defendant's counsel also submitted an affidavit of defendant and a fairly voluminous appendix[3] containing various articles bearing on the policy issue of imposing on a psychiatrist or therapist a duty of reasonable care in this or in similar situations.
Giving all reasonable inferences in favor of the party opposing this motion, as required by Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954), the factfinder could conclude from the deposition testimony and other factual sources relative to the instant litigation the *472 events hereinafter outlined. Defendant first met Lee Morgenstein, then age 15, and began his treatment on May 5, 1973, after the latter's school psychologist had given Morgenstein's parents defendant's name and that of certain other therapists, partially because of Morgenstein's involvement with drugs. His treatment was on a weekly basis for what he initially diagnosed as "an adjustment reaction of adolescence." Initially it also included family therapy. During the course of therapy over the approximate two-year period, Morgenstein related many "fantasies" to defendant on various subjects, including fantasies of fear of other people, being a hero or an important villian, and using a knife to threaten people who might intimidate or frighten him.
Morgenstein also related certain alleged experiences and emotional involvements with decedent, who in 1973 was about 20 years old and at that time lived with her parents next door to the Morgensteins. Decedent's father was a doctor who from time to time had treated Lee Morgenstein for minor ailments. Defendant considered all such "fantasies" referred to above as just that, but he came to accept, after initial reservations, that the experiences related to him by Morgenstein as to his eventual victim represented truth and not fantasy. Dr. Milano stated he was somewhat "nonplussed" initially about the revelations of Morgenstein concerning Miss McIntosh and alleged sexual experiences because of the five-year age difference. However, he said that he came to believe it because the way Morgenstein responded emotionally fit with what he told him, and Milano claimed he never had any reason to doubt Morgenstein. The doctor testified at Morgenstein's criminal trial that "[h]e [Morgenstein] didn't spend a lot of time describing in detail what he and Kim did, but that also sort of fit, if anything, his character in that he thought that nobody would believe him." Defendant did indicate in his deposition that he advised Morgenstein to break off the relationship.
Morgenstein had possessive feelings towards Kimberly, according to the doctor, and was "overwhelmed" by the relationship. *473 Although Morgenstein is said to have repeatedly expressed anxiety to defendant over his relationship with Miss McIntosh, defendant asserts she was not the dominant theme of the therapy.[4]
It is undisputed, and Dr. Milano admits, that Morgenstein had confided that he had fired a B.B. gun at what he recalled to be a car (Miss McIntosh's or her boyfriend's) on one occasion when he was upset because she was going on a date with her boyfriend. There is evidence proffered by plaintiff that other windows in the McIntosh house and another vehicle had been shot at and damaged by a B.B. or some other gun, and a factfinder might infer that these were actions of Morgenstein. It is also undisputed that Dr. Milano had been told by Morgenstein that he had purchased and carried a knife to show to people to scare them away if they should attempt to frighten or intimidate him, and brought it to a therapy session to show the doctor.
Although Dr. Milano said that Morgenstein wished Miss McIntosh would "suffer" as he did and had expressed jealousy and a very possessive attitude towards her, was jealous of other men and hateful towards her boyfriends, had difficulty convincing himself that fights or things were really over or finished, he denied that Morgenstein ever indicated or exhibited any feelings of violence toward decedent or said that he intended to kill her or inflict bodily harm. Morgenstein was also very angry that he had not been able to obtain Miss McIntosh's phone number when she moved from the family home. He may not even have known where she lived in 1975. Plaintiff proffered testimony that Miss McIntosh had told her family of Morgenstein's drug problems, felt sorry for him, and hoped he could get help.
*474 Following an incident in which Morgenstein fell off a bicycle and injured his face the day before the July 8, 1975 therapy session, and after an incident during the course of that day's therapy (apparently when Dr. Milano briefly left the room), he stole a prescription form from the doctor's desk. Later that day he attempted to obtain 30 Seconal tablets[5] from a pharmacist with the stolen form. The pharmacist apparently became suspicious and called Dr. Milano, who instructed him to retain the unauthorized prescription form, not to fill it, and to send Morgenstein home. He later tried to reach Morgenstein at home, but between then and the early evening hours Morgenstein was involved in the tragedy which took Miss McIntosh's life. Whatever exactly transpired thereafter, it would appear that Morgenstein left the pharmacy upset and at some point either late that afternoon or early evening obtained a pistol which he had kept hidden at his home, and knowing Miss McIntosh was expected to visit her parents, waited for her and either got her to go with him, wittingly or unwittingly, to a local park area where he fatally shot her in the back.
Dr. Milano had indicated in his testimony at the criminal trial that sometimes he inquired further when he felt that a patient was in some ways endangering himself or someone else, and in those instances he would contact his patient's *475 parents, school, or people like that. In his deposition in this civil case Dr. Milano said he had spoken to Morgenstein's parents about a problem with a car accident and this resulted in their withholding certain privileges from their son. He also indicated he spoke to a school teacher about one of Morgenstein's problems. Apparently this was usually with Morgenstein's consent. Dr. Milano had said he would "look into it" if he felt the patient was endangering himself or someone else. He apparently talked to Morgenstein's parents in some fashion about the relationship between their son and Miss McIntosh a number of times in late 1974 and in 1975, but never attempted to contact decedent or her parents. Despite Morgenstein's fantasies and the incidents previously recited, and wishes for her suffering, he felt that Morgenstein had never expressed a desire for retaliation or "fantasies" of retaliation.[6] Dr. Milano had said at the criminal trial that *476 Morgenstein had fantasies of magical power and violence, which meant that if somebody said he was a scrawny little runt and wouldn't dare fight back, that he would be able to pull out a gun and shoot them. But he denied that Morgenstein ever had fantasies of pulling out a gun, and claimed that his fantasies apparently related to pulling out a knife and scaring people off. Morgenstein, nevertheless, was quoted as saying that if he had a gun, that would scare men and then nobody would dare threaten him.
In the evening of July 8, 1975 Dr. Milano was called to police headquarters after decedent's death and spoke to Morgenstein, who was then in custody. He asked Morgenstein where he had gotten the gun and why he had not told him about it. Morgenstein responded he was frightened, and was unsure about what the doctor would have done. There was also discussion at that time about earlier events of that day, including Morgenstein's taking of the prescription form.
Obviously, all factual statements would be subject to jury scrutiny as to credibility.
Plaintiff instituted this wrongful death action[7] based in large part on the trial testimony of Dr. Milano. She relies also on a report of a psychiatrist retained as an expert witness expressing the opinion that defendant had a duty to warn Kimberly McIntosh, her parents or appropriate authorities that Morgenstein posed a physical threat or danger to decedent. Plaintiff asserts defendant breached that duty.
On the other hand, defendant argues there is no such duty by a therapist to third parties or potential victims, and that Tarasoff II should not be applied, and was wrongly decided *477 in that it (1) imposes an "unworkable" duty on therapists to warn another of a third person's dangerousness when that condition cannot be predicted with sufficient reliability;[8] (2) will interfere with effective treatment by eliminating confidentiality; (3) may deter therapist from treating potentially violent patients in light of possible malpractice claims by third persons; and (4) will result in increased commitments of patients to mental or penal institutions.
In addition, defendant argues that the McIntosh family was aware of Lee Morgenstein's problems and that he had apparently threatened Kimberly on at least one occasion. However, this is immaterial to the legal question of the existence of any duty in the factual context presented and goes rather to a factual defense. Therefore, it is unnecessary to consider that defense at length here.
Plaintiff, in opposition to the motion, relies on the report of her expert, a psychiatrist, who states that defendant committed a "gross deviation" from accepted medical practice by failing to warn or protect decedent under the factual circumstances *478 he derives from defendant Milano's report to the prosecutor and testimony at the Morgenstein trial. Plaintiff's expert opines that it is clear from the criminal trial testimony of Dr. Milano that Lee Morgenstein was a dangerous individual, and the object of his aggression was Miss McIntosh. Even though a diagnosis of dangerousness is recognized by that proposed expert witness as a complex determination, in his opinion that was not an issue since Morgenstein demonstrated his dangerousness by (a) firing a weapon at Miss McIntosh's car, (b) exhibiting a knife to Dr. Milano, (c) forging a prescription, and (d) verbalizing threats towards Miss McIntosh and her boyfriends. In light of this and the commission of a violent act, i.e., firing the gun, dangerousness was not in his opinion a prediction, but a known fact.
Plaintiff's expert indicates there appears to be no doubt as to dangerousness because Dr. Milano admitted in his testimony that Morgenstein had fantasies of violence or feelings of retribution.

I

Duty to Warn of "Dangerousness" and Alleged Inability to Predict
The argument in this case is whether principles analogous to those expressed in Tarasoff II apply or should be applied in New Jersey. That case was a lawsuit against university regents, psychotherapists employed by the university hospital, and campus police to recover for the murder of plaintiffs' daughter by a psychiatric patient. It was alleged that the patient had expressly informed his therapist that he was going to kill an unnamed girl (identifiable as plaintiff's decedent) when she returned home from spending the summer in Brazil. The therapist, with the concurrence of two colleagues, decided to commit the patient for observation. The campus police detained the patient at the oral and written request of the therapist, but released him after somehow satisfying themselves that he was rational and *479 exacting his promise to stay away from the girl. The therapist's superior then ordered all copies of his subordinate's letter to the police and therapy notes destroyed and directed that no further steps be taken for commitment or evaluation. After the patient subsequently murdered the girl her parents filed suit alleging, among other things, that the therapists involved had failed either to warn them of the threat to their daughter or to detain the patient as "dangerous." 17 Cal.3d at 432-433, 131 Cal. Rptr. at 21, 551 P.2d at 341. Allegations against the university and its hospital and the campus police were also made, but were disposed of under the California Tort Claims Statute.
A majority of the California Supreme Court imposed a duty on the defendant therapists, holding:
* * * When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. [17 Cal.3d at 431, 131 Cal. Rptr. at 20, 551 P.2d at 340]
The California court concluded that the relationship between the patient and defendant therapists supported an affirmative duty for the benefit of third persons and sustained the second of four stated causes of action in the complaint. They did uphold the therapists' contention that statutory immunity insulated them from liability for failure to confine. 17 Cal.3d at 447, 131 Cal. Rptr. at 31, 551 P.2d at 351. One justice concurred only in the result, expressing concern (and a dissent) as to the lack of "standards of the [phychiatric] profession" in terms of reliable prediction of violence and preferring to limit the holding to instances where a therapist actually predicted potential violence. Two dissenting justices argued that policy considerations weighed against imposition of such a duty and that the California Welfare and Institutions Code, §§ 5000 et seq. (that state's commitment statute) required confidentiality and thus imposed a duty not to disclose. The majority had rejected that conclusion because they did not consider the statute applicable.
*480 Plaintiff in the instant case asserts that a duty of a therapist towards third parties or potential victims is appropriate under the law of this State and forms a basis for a claim of actionable negligence analogous to that in Tarasoff II. Defendant asserts such a duty is unworkable, particularly if it is attempted to be imposed on therapists relative to third persons when there is an asserted inability to accurately predict dangerousness. The issue of duty in such situations is admittedly complex, and there are countervailing public policy aspects to be weighed and considered, as may be seen from the discussion in Tarasoff II and the articles referred to herein.
Psychiatry, as a specialty of medical practice, has most often come in contact with the law through expert witness testimony. The psychiatrist (who is sometimes referred to as a therapist, although that term can have broader application) is usually a participant in litigation in connection with the giving of his professional opinion testimony as to criminal insanity, mental illness, or in civil commitments. Often he also plays a role in matrimonial actions, child custody cases, and torts involving emotional or psychological trauma.
A question has been raised as to whether there should be any legal duty in the factual setting projected. The corollary question may also be asked whether an injured or wronged individual, whether a patient or third party, should be denied a remedy based on a practitioner's actions or inactions (if violative of the appropriate duty and standard) because a therapist deals or confines his practice to an area of medical expertise dealing with emotions and mental disorders or problems. Reference is not being made to malpractice claims growing out of "physical" torts, such as an assault and battery, or to claims by the legal representative of a patient who has committed or attempted suicide.
Actionable negligence from which liability may arise consists of various essential elements, including a disregard *481 or violation of a duty imposed by the law. Reilly v. 180 Club, Inc., 14 N.J. Super. 420, 423 (App. Div. 1951). A prerequisite to liability is a breach of such duty by either action or inaction, so that if there had been observance of the duty the injury to plaintiff would have been averted or avoided. See Fortugno Realty Co. v. Schiavone-Bonomo Corp., 39 N.J. 382, 393 (1963); Brody v. Albert Lifson & Sons, Inc., 17 N.J. 383, 389 (1955); Magro v. Vineland, 148 N.J. Super. 34, 39 (App. Div. 1977). Duty has been referred to as neither an abstract nor an absolute concept but "is largely grounded in the natural responsibilities of social living and human relations, such as have the recognition of reasonable men. * * *" Wytupeck v. Camden, 25 N.J. 450, 461-462 (1957).
Realistically, however, duty does partake of many of the characteristics of an abstract term as defined in standard dictionaries, and thus may be difficult or impossible to define in absolute and precise terms, even when applied to specific facts. Similarly, the terms "dangerous" or "dangerousness"[9] have abstract qualities, as do such concepts as reasonableness, beauty and so forth. Even though State v. *482 Krol, 68 N.J. 236 (1975), discussed dangerous conduct, obviously there will be room for debate as to the definition and application to specific settings.
* * * Dangerous conduct is not identical with criminal conduct. Dangerous conduct involves not merely violation of social norms enforced by criminal sanctions, but significant physical or psychological injury to persons or substantial destruction of property. Persons are not to be indefinitely incarcerated because they present a risk of future conduct which is merely socially undesirable. [at 259]
It may be true that there cannot be 100% accurate prediction of dangerousness[10] in all cases. However, a therapist does have a basis for giving an opinion and a prognosis based on the history of the patient and the course of treatment. Where reasonable men might differ and a fact issue exists, the therapist is only held to the standard for a therapist in the particular field in the particular community. Unless therapists clearly state when called upon to treat patients or to testify that they have no ability to predict or even determine whether their treatment will be efficacious or may even be necessary with any degree of certainty, there is no basis for a legal conclusion negating any and all duty with respect to a particular class of professionals. This is not to say that isolated or vague threats will of necessity give rise in all circumstances and cases to a duty.
Whether a duty exists for a therapist to warn or guard against a criminal or tortious event by a patient to some third *483 party, depends, as with other situations giving rise to a possible legal obligation to exercise due care, ultimately on questions of fairness involving a weighing of the relationship of the parties, the nature of the risk involved, and the public interest in imposing the duty under the circumstances. See Goldberg v. Newark Housing Auth., 38 N.J. 578, 583 (1962); Czech v. Aspen Industrial Center, 145 N.J. Super. 597, 600 (App. Div. 1976), certif. den. 73 N.J. 48 (1977); see also, Prosser, Law of Torts (4 ed. 1971), § 53 at 324-327.
Generally, a person (the first person) does not have a duty to control the conduct of another person (the second person and the potential tortfeasor) so as to prevent that person from harming a third person unless a special relationship[11] exists either between the first person and the second person imposing such a duty or between the first person and the third person giving him a right to protection. See Restatement, Torts 2d, § 315 at 122 (1965). Absent some form of special relationship, the general rule to date in most jurisdictions has been that set forth in § 314 of the Restatement, Torts 2d, at 116, which acknowledges that the fact that a person realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose a duty to take such action.
*484 However, that section indicates that it should be read together with other sections. The comment to § 314 contains the following:
The result of the rule [that even if an actor realizes or should realize that action is necessary for another's protection does not impose a duty  absent special circumstances or special relationship] has been a series of older decisions to the effect that one human being, seeing a fellow man in dire peril, is under no legal obligation to aid him, but may sit on the dock, smoke his cigar, and watch the other drown. Such decisions have been condemned by legal writers as revolting to any moral sense, but thus far they remain the law. It appears inevitable that, sooner or later, such extreme cases of morally outrageous and indefensible conduct will arise that there will be further inroads upon the older rule.
See also Restatement, Torts 2d, § 314A at 118, which sets forth illustrative "Special Relations Giving Rise to Duty to Aid or Protect," and containing a caveat wherein "[t]he Institute expresses no opinion as to whether there may not be other relations which impose a similar duty."
The Tarasoff II duty has received criticism from some, but not all authors, mostly those in the medical professions.[12] However, the concept of legal duties for the medical profession is not new. A doctor-patient relationship in some circumstances admittedly places a duty to warn others of contagious diseases. New Jersey recognizes the general rule that a person who negligently exposes another to a contagious disease, which the other contracts, is liable in damages. See Earle v. Kuklo, 26 N.J. Super. 471, 475 (App. Div. 1953). Specifically, a physician has the duty to warn third persons against possible exposure to contagious or infectious diseases, e.g., tuberculosis, venereal diseases, and so forth. See also, 61 *485 Am. Jur.2d, Physician, Surgeons, etc., § 142 at 273-274 (1972); Annotation, "Liability of physician for permitting exposure to infectious or contagious disease," 5 A.L.R. 926 (1920). That duty extends to instances where the physician should have known of the infectious disease. See Hofmann v. Blackmon, 241 So.2d 752, 753 (Fla. D. Ct. App. 1970); cf. Fosgate v. Corona, 66 N.J. 268, 274 (1974). This was noted in the Tarasoff II opinion. See 17 Cal.3d at 436-437, 131 Cal. Rptr. at 24, 551 P.2d at 344.
Physicians also must report tuberculosis, venereal disease and various other contagious diseases, see e.g., N.J.S.A. 26:4-15, as well as certain other conditions.[13] There is, to be sure, a relative certainty and uniformity present in a diagnosis of most physical illnesses, conditions and injuries as opposed to a psychiatric prediction of dangerousness based on symptoms and historical performance. Nevertheless, psychiatrists diagnose, treat and give opinions based on medical probabilities, particularly relying on a patient's history, without any clear indication of an inability to predict that is here asserted.
As a further illustration of types of duties imposed by statutes, N.J.S.A. 2A:97-2 provides that any person who has knowledge of actual commission of high misdemeanors and certain other crimes, but fails to report or disclose same, *486 is himself guilty of a misdemeanor.[14] No exception is set forth therein for a physician.
To threaten[15] to take the life of another person is also a crime. See State v. Milano, 167 N.J. Super. 318, 321 (Law Div. 1979). N.J.S.A. 2A:113-8 provides, in pertinent part:
Any person who, in public or private, by speech, writing, printing or drawing, or by any other method:
* * *
b. Threatens to take or procure the taking of the life of any person  Is guilty of a high misdemeanor * * *.[16]
Disclosure is, therefore, required in numerous situations. As noted in Point II, infra, even the Principles of Medical Ethics recognize that confidentiality gives way where "it becomes *487 necessary in order to protect the welfare of the individual or of the community."[17]
Although defendant asserts public policy or public interest in the patient-therapist relationship as a reason for a holding of no duty, such an argument views only one side of the problem.
As for the public policy, the strongest policy which appeals to us is that fundamental theory of the common law that for every wrong there should be a remedy. [Lambert v. Brewster, 97 W. Va. 124, 138, 125 S.E. 244, 249 (Sup. Ct. 1924)]
Certainly there also should be protection against frivolous or fraudulent suits, but the remedy lies not in eliminating all causes of action by aggrieved individuals against a certain class, but in improving the competence of the court system to deal with such claims. Groundless claims are always a risk.[18]
Obviously, the courts should not dismiss a complaint on the sole ground that a question or issue is too complex, or may provide a vehicle for an unscrupulous person to assert a frivolous or unfounded claim. The nature of our court system and the policy of allowing liberal access of litigants to the courts for redress of grievances cannot totally prevent this. Cf. the comments of Justices Jacobs and Schettino (concurring) in Bergen Builders, Inc. v. Horizon Developers, Inc., 44 N.J. 435, 439 (1965), and the subsequent statement by the majority of the Supreme Court in Gerhardt v. Continental Ins. Co., 48 N.J. 291, 301 (1966). Nor can plaintiff in this case be precluded from seeking to establish her cause of action and have a determination made on the facts as she alleges them to be, and grounded upon the stated standard of care set forth by her expert psychiatrist who has opined that *488 defendant committed a gross deviation from the standard of practice.
It was implicitly recognized in Fernandez v. Baruch, 52 N.J. 127, 130-131 (1968), aff'g in part, rev'g in part, 96 N.J. Super. 125 (App. Div. 1967), that there is generally a need for a plaintiff asserting a malpractice claim to establish accepted professional standards with regard to the propriety of a psychiatric diagnosis. In that case the necessity for establishing an appropriate standard at a trial was amply discussed.
There may well be problems of proof. Whether plaintiff will ultimately prevail is an open question on which this court expresses no opinion as to the factual outcome. However, the law in most malpractice cases requires the jury to be aided by an expert. Thus, defendant also has the opportunity of presenting and refuting evidence as to the appropriate applicable standard of care[19] in his field and in the applicable *489 community according to the standards in effect at the time of the alleged occurrences. See generally, Schueler v. Strelinger, 43 N.J. 330 (1964); Sanzari v. Rosenfeld, 34 N.J. 128 (1961), and Carbone v. Warburton, 11 N.J. 418 (1953). This type and amount of training received in medical education is an element to be established at trial.
Here, the jury could find that Dr. Milano knew or should have known that Morgenstein presented a clear danger or threat to Miss McIntosh. They could also find, based on the facts adduced, that there was a duty which was indeed recognized by defendant, who indicated that he would inquire when he felt a patient was endangering himself or others and might as a result contact appropriate persons, or as he said, "look into it." A jury might also find that what was originally stated in defendant's report to the prosecutor (see n. 6, supra) to the effect that Morgenstein had "desires" for retaliation was fact, even though crossed out of the report, and was supported by other evidence they might well find credible. They might also find that Morgenstein led Dr. Milano on or misled him deliberately for various purposes, such as avoiding penal consequences of drug use or to facilitate obtaining and use of drugs.
To summarize, this court holds that a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient is or may present a probability of danger to that person. The relationship giving rise to that duty may be found either in that existing between the therapist and the patient, as was alluded to in Tarasoff II,[20] or in the more broadly based obligation a practitioner may have to protect the welfare of the community, which is analogous to the obligation *490 a physician has to warn third persons of infectious or contagious disease. That analogy may also be applied in a somewhat different fashion. To an admittedly uncertain but nevertheless sufficient extent, "dangerousness" must be considered identifiable (despite the contrary claims presented by defendant in this matter), and although not a "disease" as that term is commonly used, may affect third persons in much the same sense as a disease may be communicable. The obligation imposed by this court, therefore, is similar to that already borne by the medical profession in another context.

II

Confidentiality Aspect
Certain other aspects of the arguments raised warrant some discussion. Defendant asserts the need for confidentiality in therapy and alleges socially undesirable ramifications, particularly to patients and potential patients arising out of a Tarasoff II-type duty when therapists may not be able to accurately predict dangerousness. The dissent in Tarasoff II embraced that argument. Although New Jersey has recognized the physician-patient privilege by statute (N.J.S.A. 2A:84A-22.1 et seq.) and in the context of judicial disclosures, see e.g., Kessler v. Troum, 162 N.J. Super. 269 (Law Div. 1978); Osterman v. Ehrenworth, 106 N.J. Super. 515 (Law Div. 1969), the need for confidentiality cannot be considered either absolute or decisive in this setting. A patient is entitled to freely disclose his symptoms and condition to his physician in confidence "except where the public interest or the private interest of the patient so demands." A patient, therefore, possesses a "limited right" to confidentiality in extra-judicial disclosures, "subject to exceptions prompted by the supervening interest of society," Hague v. Williams, 37 N.J. 328, 336 (1962), just as a lawyer has no privilege in the lawyer-client relationship to protect or conceal intent to commit a crime. See DR 4-101 (C) *491 That conclusion is consonant with § 9 of the Principles of Medical Ethics (1957), which reads:
A physician may not reveal the confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community.[21]
Section 9, as well as other sections of the Principles of Medical Ethics, has been adopted and accepted by the psychiatric profession as applicable to that specialty with certain annotations pertaining specifically to Psychiatry. Those annotations referable to the quoted § 9 state:
* * * Because of the sensitive and private nature of the information with which the psychiatrist deals, he must be circumspect in the information that he chooses to disclose to others about a patient. The welfare of the patient must be a continuing consideration.
A psychiatrist may release confidential information only with the authorization of the patient or under proper legal compulsion. The continuing duty of the psychiatrist to protect the patient includes fully apprising him of the connotations of waiving the privilege of privacy.

* * *
Psychiatrists at times may find it necessary, in order to protect the patient or the community from imminent danger, to reveal confidential information disclosed by the patient. [Reprinted in 130 Am. J. Psych. 1058, at 1063 (1973); emphasis supplied]
Actually, that language could well apply to the practice of all physicians, and even to lawyers. Compare DR 4-101. Thus, there is no out-and-out professional prohibition against certain types of disclosure by therapists. The ethical consideration *492 do require a psychiatrist to be circumspect. Furthermore, the preamble of the Principles of Medical Ethics, as well as other sections, also apply to the psychiatrist and explain and clarify the expected relationship with the patient and others. The following are illustrative:
Preamble. These principles are intended to aid physicians individually and collectively in maintaining a high level of ethical conduct. They are not laws but standards by which a physician may determine the propriety of his conduct in his relationship with patients, with colleagues, with members of allied professions, and with the public.
Section 1. The principal objective of the medical profession is to render service to humanity with full respect for the dignity of man. Physicians should merit the confidence of patients entrusted to their care, rendering to each a full measure of service and devotion.

* * *
Section 3. A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily associate professionally with anyone who violates this principle.

* * *
[Annotations to Section 1 applicable to psychiatrists warn them to guard against exploiting the patient.]
In an article by Dr. Eric A. Plaut, "A Perspective on Confidentiality," 131 Am. J. Psych. 1021 (1974), he specifically states that the confidential privilege of a psychiatrist is not total. He compares the situation of the psychiatrist and the patient with the priest-penitent[22] relationship and distinguishes them on the basis of an interesting correlation with "civil authority":
As the Watergate incident has demonstrated, there is no such thing as total confidentiality under American Law, not even under executive privilege. However, the courts have traditionally been extremely reluctant to have a priest divulge material from the confessional. This priest-penitent relationship has not been subject to the large number of limitations placed on the confidentiality of the psychiatrist-patient relationship. Underlying this distinction is the *493 separation of church and state specified in the Constitution. With the interesting exception of the marriage ceremony, the clergyman has no civil authority whatever. It is this absence of civil authority which allows for the almost total confidentiality of the priest-penitent relationship. Conversely, psychiatrists have extensive civil authority, e.g., in circumstances involving abortions, personal injury suits, commitment procedures, and not-guilty-by-reason-of-insanity pleas. So long as we retain civil authority, our claim to confidentiality will always be subject to compromise. [131 Am. J. Psych. at 1022]
Other medical writers have acknowledged a duty to disclose when compelled by law or if an imminent danger to the patient or to society exists. See, e.g., Sadoff (M.D.), "Changing Laws and Ethics in Psychiatry," 5 Bull. Am. Acad. Psych. & L. 34, 37 (1977). Thus, considerations of confidentiality have no over-riding influence here.

III

Other Alleged Implications
Defendant also claims that the imposition of a Tarasoff type duty may deter therapists from treating potentially violent patients in light of possible malpractice claims by third persons.[23] However, even the statement of that policy position involves some inconsistency. If the psychiatrist claims inability to predict dangerousness or detect a dangerous person, how will he make the determination to weed out "potentially violent patients"?
*494 One medical commentator stated that the court in Tarasoff decided that case on the mistaken premise that psychiatry had some ability to predict dangerous action. In Gurevitz, "Tarasoff: Protective Privilege Versus Public Peril," 134 Am. J. Psych. 289, 291 (1977), that writer said as to the ability to predict dangerous action: "Psychiatry does not have these abilities, but we have in fact acted as though we did."
Perhaps the Tarasoff II decision does assume or accept that the psychiatrist has some ability (or at least has some special training) to detect and predict dangerousness. In that regard the court noted:
* * * [T]he judgment of the therapist in diagnosing emotional disorders and in predicting whether a patient presents a serious danger of violence is comparable to the judgment which doctors and professionals must regularly render under accepted rules of responsibility. [17 Cal.3d at 438, 131 Cal. Rptr. at 25, 551 P.2d at 345]
Even the U.S. Supreme Court hinted in O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396, 407 (1975), that involuntary commitment in which a person is deprived of liberty must be based on a standard of dangerousness to self or others. More recently, it held in Addington v. Texas, ___ U.S. ___, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), that due process demands a "clear and convincing" standard of proof of mental illness in civil commitment proceedings. Compare commitments in this State pursuant to statute (N.J.S.A. 30:4-23 et seq.)[24] and court rule (R. 4:74-7). If psychiatrists now say, as is argued in the brief of defendant and the articles submitted in support thereof, that therapists are no more accurate than the *495 average layman, serious questions would arise as to the entire present basis for commitment procedures.
In considering in the absence of statute whether or not there should be a legal duty or a remedy for a wrong, the courts cannot determine legal relationships based only on ipse dixit and assumptions that a certain course of action will follow without regard to medical or professional responsibility and ethical considerations, as well as appropriate legal considerations. If accepted, defendant's argument would establish a sphere of immunity from liability "for the foreseeable results" of the action or inaction of a therapist (assuming the factfinder might reasonably find it was a foreseeable result). Whether a duty exists is a question of law. Failure in that duty must be proved as a fact and established by application of the law to the facts. McKinley v. Slenderella Systems of Camden, N.J., Inc., 63 N.J. Super. 571, 581 (App. Div. 1960). In Essex v. N.J. Bell Tel. Co., 166 N.J. Super. 124, at 127 (App. Div. 1979), the court again discussed "duty" in the abstract, as referred to in Wytupeck v. Camden, supra, 25 N.J. at 462:
"Duty" is not a rigid formalism according to the standards of a simpler society, immune to the equally compelling needs of the present order; duty must of necessity adjust to the changing social relations and exigencies and man's relation to his fellow; and accordingly the standard of conduct, his care, commensurate with the reasonably foreseeable danger, such as would be reasonable in the light of the recognizable risk, for negligence is essentially "a matter of risk * * * that is to say, of recognizable danger of injury."
If any absolution from duty were to be evolved on the basis of social policy, it would either be for the Legislature or, as stated in Pierce v. Ortho Pharamaceutical Corp., 166 N.J. Super. 335, 342 (App. Div. 1979):
* * * [G]rounded in a specific factual and legal concept resulting from a plenary hearing, at which the proofs and public policy considerations involved will be fully developed and taken into account in the final determination.
*496 Summary judgment in favor of defendant is thus clearly inappropriate. This means no more than that there is a factual question which should be presented to a jury as to whether, based on expert testimony, defendant breached the appropriate duty in this case.
The possibility (or perhaps what could be called a threat) that in some case or cases in the future some therapists may choose not to accept some potential patients for therapy in their private practice (with obvious ramifications, and potential new causes of action) should not forever preclude victims of torts or crimes referable to the breach of duty of such therapists from being without any remedy whatsoever.
The further argument that such a duty would result in increased commitments of individuals rather than a therapist exposing himself to civil suit not only runs counter to the argument of defendant on inability to predict dangerousness, but is an argument which has no reliable statistical support or backing at the present time, if indeed it can even be established. See generally, Huff, How to Lie with Statistics (30th Printing, 1964). There has certainly been inadequate experience or data collection from which any such pronouncement could authoritatively be made, even if relevant to the issue of providing a remedy for a possible wrong.
Defendant's motion for summary judgment is denied.
NOTES
[1] Lee Morgenstein was convicted by a jury on March 4, 1976 of first degree murder of decedent and sentenced on June 23, 1976 to life imprisonment in New Jersey State Prison. On appeal in State v. Morgenstein the Appellate Division reversed in an unreported decision (Docket No. A-674-76) by a 2-1 decision, for improper and prejudicial remarks during the trial by the assistant prosecutor. On June 8, 1979 Morgenstein entered a non vult plea to a charge of murder before the trial judge. The Supreme Court had entered a remand order on May 3, 1979. Apparently application is being made to dismiss the pending appeal by the State in the Supreme Court by virtue of the dissent in the Appellate Division.
[2] This decision by the California Supreme Court vacated its prior opinion, reported at 13 Cal.3d 177, 118 Cal. Rptr. 129, 529 P.2d 553 (1974) (Tarasoff I), after a rehearing.
[3] Included in defendant's appendix is a copy of the amicus curiae brief of the American Psychiatric Association, Area VI of the Assembly of the American Psychiatric Association, et als., filed with the California Supreme Court in Tarasoff II.
[4] At the criminal trial of State v. Morgenstein, supra, Milano diagnosed Morgenstein as a "schizoid personality," which he described as a "personality disorder" and not a mental illness. He indicated that means that "under severe emotional stress, the person tends to withdraw and not show much emotion, and in fact be rather blan [sic], and apparently unemotional on the surface."
[5] It is clear from the criminal trial testimony of Dr. Milano that one of the reasons Lee Morgenstein was sent to him for therapy was because of a drug involvement, and that one of the drugs abused was Seconal. According to Milano's trial testimony, after about a year and a half of therapy Morgenstein convinced the doctor that he needed sleeping medication. The doctor initially was reluctant to give him a prescription because of the prior drug problem, but apparently relented and initially prescribed a mild medication which was replaced the following week with Seconal when Lee Morgenstein reported that it didn't work too well and was not as good as the Seconal he had used previously. The Seconal was given Morgenstein on the basis of one prescription a month for about 20 Seconal tablets, with instructions it was only to be used before a school day when he had difficulty sleeping.
[6] Plaintiff also relies on defendant's report to the prosecutor which had certain typed portions crossed out and certain interlineations made by him and by an attorney-friend who he had consulted. For example, in one portion, his report as typed said:

* * * During the latter half of the year, powerful affects of anger and jealousy, ambivalent feelings of affection and desires for retaliation emerged. They accentuated prior conflicts, and centered primarily on fantasies of revenge for Kimberly's dating and sexual experiences with other men. Lee was able, during 1974, to share some of his experiences with his parents and received their support. He saw her infrequently during 1975, though he did not develop an independent and flourishing social life.
Taking account of handwritten deletions and additions on defendant's report, those sentences, as changed, read:
* * * During the latter half of the school year, powerful affects of anger and jealousy, ambivalent feelings of affection and [] fantasies of retaliation emerged, he denied any intention of actual retaliation [] centering primarily on fantasies of revenge for Kimberly's dating and sexual experiences with other men. Lee was able, during 1975, to share some of his experiences with his parents and received their support. He saw [] Kim infrequently during 1975, though he did not develop an independent and flourishing social life. [Deleted portions are where brackets appear. Emphasis represents handwritten additions.]
Various other changes by way of deletions and additions appeared throughout that report. Obviously, issues of credibility arise from the report, particularly based on the additions and deletions. See e.g., Evid. R. 20. Any such questions would be for a jury.
[7] At the time of her death Miss McIntosh was emancipated and had moved away from her parent's home. Thus, no survivor action has been filed. Notwithstanding obvious limitations on a damage claim, the question is whether plaintiff has a cause of action.
[8] See Cocozza and Steadman, "The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence," 29 Rutgers L. Rev. 1084 (1976); Diamond, "The Psychiatric Prediction of Dangerousness," 123 U. Pa. L. Rev. 439 (1975); Dix, "`Civil' Commitment of the Mentally Ill and the Need for Data on the Prediction of Dangerousness," 19 Am. Behavorial Scientist 318 (1976); Ennis & Litwack, "Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom," 62 Cal. L. Rev. 693 (1974); Gurevitz, "Tarasoff: Protective Privilege Versus Public Peril," 134 Am. J. Psych. 289, 291 (1977); Hartman & Allison, "Predicting Dangerousness," Med. Trial Tech. Q. 131 (Fall 1978); MacDonald, Homicidal Threats (1968); Megargee, "The Prediction of Dangerous Behavior." 3 Crim. Just. & Behavior 3 (1976); Roth & Meisel, "Dangerousness, Confidentiality, and the Duty to Warn," 134 Am. J. Psych. 508 (1977); Shah, "Dangerousness  A Paradigm for Exploring Some Issues in Law and Psychology," Am. Psych. 224 (March 1978); Tversky & Kahneman, "Judgment under Uncertainty: Heuristics and Biases," 185 Science 1124 (1974); Note, "Imposing a Duty on Psychiatrists  A Judicial Threat to the Psychiatric Profession," 48 U. Colo. L. Rev. 283, 287 n. 26, 298-299 (1977). Cf. TIME, April 2, 1979, "Psychiatry on the Couch," at 74.
[9] In Shah, "Dangerousness  A Paradigm for Exploring Some Issues in Law and Psychology," Am. Psych. 224-225 (March 1978), the author says:

It has been suggested that dangerousness, like beauty, lies in the eye of the beholder. Certainly, the term is rather vague and appears often to receive surplus meanings. As used in this article, dangerousness refers to a propensity (i.e., an increased likelihood when compared with others) to engage in dangerous behavior. Dangerous behavior refers to acts that are characterized by the application of or the overt threat of force and that are likely to result in injury to other persons. This also defines violent behavior and, in this article, the two are considered synonymous.
* * *
While dangerousness as used in laws and regulation is clearly a legal term requiring determination by courts, such crucial determinations are often actually made by mental health `experts' as a function of judicial default. [Citation omitted]
[10] See von Hirsh, "Prediction of Criminal Conduct and Preventive Confinement of Convicted Persons," 21 Buffalo L. Rev. 717, 725-726 (1972), where the author states:

Failure to provide explicit legal standards of `dangerousness' creates the unacceptable situation where, for example, one psychiatrist can decide that, only those mental patients who are likely to perpetrate violent crimes ought to be confined, while another psychiatrist, depending upon his personal philosophy, can employ the concept of `dangerousness' to confine potential minor offenders, as well. * * *
[11] Tarasoff recognized a special relationship between a therapist and his patient, citing Restatement, Torts 2d, §§ 315-320. Comment c to #315 states that the special relation between the actor and one whom the Restatement refers to as a "third person" requiring the "actor" to control "the third person's" conduct are described in §§ 316-319. Section 319, entitled "Duty of Those in Charge of Person Having Dangerous Propensities," notes a duty to "control" a third person who the actor knows or should know is likely to cause bodily harm to others if not controlled. Although there are degrees of being "in charge" and having "control," the illustrations appended to the Restatement section, which are drawn in the context of a private hospital or sanitarium for the insane, are obviously not by way of limitation.
[12] See, e.g., Stone (M.D.), "The Tarasoff Decisions: Suing Psychiatrists to Safeguard Society," 90 Harv. L. Rev. 358, at 361 (1976). See also certain of the articles cited in n. 7, supra. However, other medical authors do not seem to have as much problem with the imposition of such a duty. See generally, Point II, infra.
[13] Physicians are also under a statutory duty to report gunshot wounds to the chief of police and county prosecutor (N.J.S.A. 2A: 170-25.7), and epilepsy to the Division of Motor Vehicles (N.J.S.A. 39:3-10.4). The obvious purpose of all such provisions is to protect society and its individual members. In the case of the Motor Vehicle Law, its purpose is to protect not only other drivers and pedestrians, but also property, if an individual might constitute a danger to himself or others while driving a motor vehicle. Confidentiality is to some extent protected where such reports are required consistent with the purpose of the various statutes. See, e.g., N.J.S.A. 39:3-10.7. Likewise, statutes on controlled dangerous substances also require a certain amount of reporting, together with some requirements and safeguards for confidentiality. See N.J.S.A. 24:21-39.
[14] This is not a requirement for disclosure of a possible crime. N.J.S.A. 2A:97-2 is repealed by the 1978 Penal Code (see N.J.S.A. § 2C:98-2) (presently scheduled to take effect September 1, 1979), and not reenacted anywhere therein.
[15] In State v. Kaufman, 118 N.J. Super. 472, 474 (App. Div. 1972), certif. den. 60 N.J. 467 (1972), the court disagreed that it is necessary to establish that the victim actually feared or is under apprehension that he was going to be killed, concluding that "the gravamen of the offense involves the communication of a threat to kill in such terms as would in the attendant circumstances convey to an ordinary individual that the language seriously threatened death."
[16] Given an admittedly expansive reading, N.J.S.A. 2A:113-8 could be construed to apply to any serious threat to kill, whether or not actually made to the victim (see State v. Milano, supra), i.e., even if only made to a psychiatrist. If so viewed, and taking into consideration that the "crime" would be complete upon the making of the threat, N.J.S.A. 2A:97-2 would impose, until repeal, a statutory obligation to disclose that threat. N.J.S.A. 2A:113-8 has also been repealed by the new Penal Code (see N.J.S.A. 2C: 98-2), and "reenacted" only insofar as it will remain a crime to threaten to commit any crime of violence or terrorize another (N.J.S.A. 2C:12-3).
[17] Principles of Medical Ethics, § 9 (1957). See also p. 491, infra.
[18] The courts are one forum for the scrutiny of such complaints. It may be that when a claim is found to be entirely groundless courts should have the power under the rules to impose sanctions. See the suggestion of Justice Pashman in his concurring opinion in Penwag Property Co., Inc. v. Landau, 76 N.J. 595, 600 (1978).
[19] As noted in McNiece, "Psychic Injury and Tort Liability in New York," 24 St. John L. Rev. 1, 75-76 (1949), standard of care is not always an easy area of proof:

A final difficulty with psychiatric testimony is that, like most expert testimony, it is adversary in character. The plaintiff hires his psychiatrist who has, of course, been selected because his report is favorable to the plaintiff, and the defendant employs a psychiatrist favorable to his side in an effort to rebut the testimony of the plaintiff's expert. This is not to impugn the character of the expert witnesses or to imply that their opinions are swayed by the payment of a fee. In the great majority of the cases the experts are entirely honest, and their disagreement is simply a typical illustration of reasonable minds differing in their opinions. Then too, there is the further difficulty that at present the personality of the expert is so important a factor in deciding cases. The jury all too often is impressed by the erudite-appearing expert who states his conclusions in a dogmatic manner, and may well decide the case in favor of the party for whom such an expert testifies while in reality the less sure-spoken expert of the other side may have the better of the argument from the strictly scientific point of view. It is common knowledge that some psychiatric experts have an excellent "courtroom presence" and a flair for the dramatic which is likely unduly to impress the lay jury.
[20] See n. 11, supra.
[21] Compare also the following provision of the Hippocratic Oath (quoted in 37 N.J. at 332) which can be read to allow disclosures necessary to protect society and its members:

Whatever, in connection with my professional practice, or not in connection with it, I see or hear, in the life of men, which ought not to be spoken of abroad, I will not divulge, as reckoning that all such should be kept secret.
[22] But see In Matter of Keenan v. Gigante, 47 N.Y.2d 160, 417 N.Y.S.2d 226, 390 N.E.2d 1151 (Ct. App. 1979).
[23] Experience has shown that for various reasons malpractice cases are not easy cases for plaintiffs to win. Deviations from accepted professional standards are difficult to prove. Concern has been voiced over unwillingness of members of the medical profession to testify against each other even where the most obvious and flagrant cases appeal for reparation. See Belli, "Ready for the Plaintiff  Suing the Doctor: A Frustrating Tort," 30 Temp. L.Q. 408 (1957); and cf. Reynolds v. Struble, 128 Cal. App. 716, 18 P.2d 690 (D. Ct. App. 1933); Johnson v. Winston, 68 Neb. 425, 94 N.W. 607 (Sup. Ct. 1903).
[24] The statute creates a procedure for commitment, not a standard for medical practice as such, so no affirmative obligation would arise directly from the commitment statute. See Fernandez v. Baruch, 96 N.J. Super. 125, 135-136 (App. Div. 1967), rev'd on other grounds 52 N.J. 127 (1968).