224 N.J. Super. 252 (1988)
540 A.2d 212
IN THE MATTER OF RULES ADOPTION REGARDING INMATE-THERAPIST CONFIDENTIALITY [N.J.A.C. 10A:16-4.4].
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1988.
Decided April 4, 1988.
*254 Before Judges O'BRIEN, HAVEY and STERN.
Catherine A. Hanssens, Assistant Deputy Public Defender, argued the cause for appellant (Alfred A. Slocum, Public Advocate/Defender of New Jersey, attorney; Catherine A. Hanssens, of counsel and on the brief).
Stephen P. Tasy and Vicki A. Mangiaracina, Deputy Attorneys General, argued the cause for respondents (W. Cary Edwards, Attorney General of New Jersey, attorney; Michael R. Clancy, Deputy Attorney General, of counsel; Stephen P. Tasy and Vicki A. Mangiaracina, on the brief).
Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys for amicus curiae New Jersey Psychological Association (Gregory B. Reilly, of counsel; Gregory B. Reilly and Rochelle B. Galiber, on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
The Office of Inmate Advocacy, as authorized by N.J.S.A. 52:27E-1 et seq., appeals from a portion of regulations adopted by the Department of Corrections (DOC) concerning psychological *255 services provided for prison inmates.[1] In response to our decision in Zeltner v. N.J.Dept. of Corrections, 201 N.J. Super. 195, 200 (App.Div.), certif. den. 102 N.J. 299 (1985), administrative standard 520 was proposed for adoption as a rule pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., as N.J.A.C. 10A:16-4.4. See 18 N.J.R. 1667, published on August 18, 1986. By letter of August 30, 1986, Kevin F. Fitzgerald, an inmate, filed an exception to proposed N.J.A.C. 10A:16-4.4(c) 2 through 5. The New Jersey Psychological Association (NJPA) likewise filed an exception. Pursuant to N.J.S.A. 52:14B-4, a hearing was conducted on September 9, 1986. Subsequent to the hearing, N.J.A.C. 10A:16-4.4 was adopted on March 6, 1987 by the commissioner effective April 6, 1987. See 19 N.J.R. 541. The Public Advocate filed his appeal to portions of N.J.A.C. 10A:16-4.4 pursuant to R. 2:2-3(a)(2). By order of January 11, 1988, we authorized NJPA to file a brief amicus curiae. At oral argument DOC advised us that it did not consider it necessary to respond to the amicus brief.
N.J.A.C. 10A:16-4.4, portions of which are objected to by Fitzgerald, the Public Advocate and the NJPA, reads as follows:
Inmate/Therapist Confidentiality
(a) Confidential relations between and among clinical practitioners and individuals or groups in the course of practice, are privileged communications, not to be disclosed to any person.

*256 (b) Privileged communications are subject to certain exceptions where it is found or believed that disclosure is more important to the present and future interests of substantial justice or safety of persons, than protection from injury to the clinical practitioner/patient relationship or to the inmate or others whom disclosure is likely to harm.
(c) The following exceptions to privileged communications are applicable only in situations which present a clear and imminent danger to the inmate or others.
1. Where the inmate discloses planned action which involves a clear and substantial risk of imminent serious injury, disease or death to the inmate or another identifiable person;
2. Where an escape plan is disclosed to the clinical practitioner;
3. Where drug trafficking for profit or illicit influence on others, involving Controlled Dangerous Substances (CDS) or drug paraphernalia which may result in:
i. Injury (for example, transmission of disease by sharing of hypodermic needles, etc.);
ii. Disorder; or
iii. Other interference with the orderly operation of the correctional facility is disclosed.
4. Where the inmate discloses suicide plans or other life threatening behavior; and/or
5. Where the inmate discloses a past, previously unreported murder, aggravated sexual assault or arson which resulted in a death. For the purpose of this Subsection, aggravated sexual assault shall mean those offenses set forth in N.J.S.A. 2C:14-2(a). Past crimes shall be disclosed only where circumstances present a reasonably foreseeable danger in the present or future due to the nature of the past crime.
The rule then sets forth the procedure to be followed by the clinical practitioner receiving such information. The portions of the rule to which Fitzgerald and the Public Advocate object are N.J.A.C. 10A:16-4.4(b) and (c) 2, 3, 4[2] and 5. NJPA does not object to (c) 2 since "an escape attempt will almost always endanger the inmate and/or others," nor does it object to (c)4.
The confidential relations and communications between and among a licensed practicing psychologist and individuals, couples, families or groups in the course of the practice of psychology are placed on the same basis as those provided between attorney and client. See N.J.S.A. 45:14B-28, which further *257 provides that "nothing in this act shall be construed to require any such privileged communication to be disclosed by any such person." The regulations of the Board of Psychological Examiners defining misconduct, for purposes of the licensing statute and to regulate the need to safeguard client confidences, read in pertinent part as follows:
N.J.A.C. 13:42-4.1 Misconduct; Generally
(a) Misconduct, as grounds for revocation, suspension, refusal to renew or grant a license shall include but not be limited to the following:
1. Misconduct in the practice of psychology by persons licensed by the State Board of Psychological Examiners;
........
xvii. Participating in a conflict of interest may include:
(1) Dual relationships which could limit objectivity, impair professional judgment or increase risk of exploitation. Examples of such dual relationships include but are not limited to research using or treatment of employees, tenants, students, supervisees, close friends or relatives.
........
(4) Exploitation of the trust and dependency of clients....
xxiv. Failure to maintain professional confidentiality including the following:
(1) Failure to safeguard information about an individual that has been obtained by a psychologist in the course of his or her teaching, practice, or investigation unless:
(A) There is a clear and imminent danger to the individual or the public. In such cases information should be revealed only to appropriate professional workers, public authorities and the threatened individual(s) or their representatives....
Lastly, the "ethical principles of psychologists" adopted by the American Psychological Association highlights the importance of the privilege afforded confidential communications between psychologists and their patients. Principle 5 states that:
Psychologists have a primary obligation to respect the confidentiality of information obtained in the course of their work as psychologists. They reveal such information to others only with the consent of the person or the person's legal representative, except in those unusual circumstances in which not to do so would result in clear danger to the person or to others....
[American Psychologist, Vol. 36, No. 6, pp. 635-636 (June 1981).]
The conflict between the duty of the clinical practitioner to maintain confidentiality on the one hand and to warn on the *258 other is not without difficulty. See Duty to Warn Versus Duty to Maintain Confidentiality: Conflicting Demands on Mental Health Professionals, 20 Suffolk U.L.Rev. 579 (1986).
The first judicial recognition of a psychotherapist duty to warn or to take reasonable steps to prevent harm to potential third-party victims occurred in Tarasoff v. Regents of the University of California, 17 Cal.3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976). The issue was projected in a suit by the parents of a murder victim against psychotherapists employed by a university hospital, among others, since the murderer confided his intention to kill the victim to a psychologist at whose request the campus police briefly detained the murderer but released him when he appeared rational. The psychologist's superior allegedly directed that no further action be taken to detain the murderer. No one warned the victim nor her parents of the peril. A majority of the California Supreme Court imposed a duty on the defendant therapist, holding:
When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. [17 Cal.3d at 431, 131 Cal. Rptr. at 20, 551 P.2d at 340.]
In reliance upon the Tarasoff case, the Law Division adopted a similar rule in the State of New Jersey in McIntosh v. Milano,[3] 168 N.J. Super. 466, 489 (Law Div. 1979), where the court held:
... that a psychiatrist or therapist may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient when he determines, or should determine, in the appropriate factual setting and in accordance with the standards of his profession established at trial, that the patient or may present a probability of danger to that person.
In discussing the confidentiality aspect, the court held
A patient is entitled to freely disclose his symptoms and condition to his physician in confidence except `where the public interest or the private interest *259 of the patient so demands.' A patient, therefore possesses a `limited right' to confidentiality in extrajudicial disclosures, `subject to exceptions prompted by the supervening interest of society.' Hague v. Williams, 37 N.J. 328, 336] (1962), just as a lawyer has no privilege in the lawyer-client relationship to protect or conceal intent to commit a crime. [Id. at 490.]
The McIntosh court referred to sections of Principles of Medical Ethics which have been adopted by the psychiatric profession as applicable to that specialty with certain annotations pertaining specifically to psychiatry. Specifically, the judge quoted from section 9 which reads as follows:
* * * Because of the sensitive and private nature of the information with which the psychiatrist deals, he must be circumspect in the information that he chooses to disclose to others about a patient. The welfare of the patient must be a continuing consideration.
A physician may release confidential information only with the authorization of the patient or under proper legal compulsion. The continuing duty of the psychiatrist to protect the patient includes fully apprising him of the connotations of waiving the privilege of privacy.
* * * * * * * *

Psychiatrists at times may find it necessary, in order to protect the patient or the community from imminent danger, to reveal confidential information disclosed by the patient. [Id. at 491; emphasis in original.]
Both in its brief and at oral argument DOC takes the position that it has fully recognized the Tarasoff rule by making all of the exceptions applicable only in situations "which present a clear and imminent danger to the inmate or others." Appellants do not object to section (c), subsection 1, which reads:
(c) The following exceptions to privileged communications are applicable only in situations which present a clear and imminent danger to the inmate or others.
1. Where the inmate discloses planned action which involves a clear and substantial risk of imminent serious injury, disease or death to the inmate or another identifiable person;
and the NJPA has no objection to subsection 2 which reads:
2. Where an escape plan is disclosed to the clinical practitioner;
Appellants agree these provisions sufficiently comply with the Tarasoff concept. However, appellants argue that the language of (b) and exceptions (c)3 and 5 are inconsistent with the intention to limit any exceptions to those situations which present a clear and imminent danger to the inmate or others. We agree.
*260 The broad language of paragraph (b) appears to contradict the stated limitations. It provides:
Privileged communications are subject to certain exceptions where it is found or believed that disclosure is more important to the present and future interests of substantial justice or safety of persons, than protection from injury to the clinical practitioner/patient relationship or to the inmate or others whom disclosure is likely to harm.
Similarly, subsection 3 of (c) concerning drug trafficking which may result in "ii. Disorder" or "iii. other interference with the orderly operation of the correctional facility" is certainly broader than a situation which presents a clear and imminent danger to the inmate or others.
The exception to confidentiality regarding disclosure of past crimes requires disclosure of specified past crimes based upon a finding that "the nature of the past" crime presents a "reasonably foreseeable danger in the present or future." Thus, the regulation requires disclosure, without regard to the existence of an identifiable intended victim, based only upon dangerousness indicated by the prior act.
DOC agrees that inmates are entitled to receive reasonable medical care to meet their needs while incarcerated, Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), reh'g den. 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977), and this includes the right to psychiatric or psychological care as well as physical care. See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 763 (3rd Cir.1979). However, DOC argues that incarceration will inevitably result in limitations upon the prisoners' constitutional rights. See Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629, 638 (1977). In determining whether a particular restriction upon an inmate's constitutional rights is appropriate, it has recently been held that the standard to be applied is whether the restriction is reasonably related to a legitimate penological goal of the corrections system, such as the maintenance of security. Turner v. Safley, ___ U.S. ___, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, 79 (1987); O'Lone v. Estate *261 of Shabazz, 482 U.S. ___, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282, 290 (1987). DOC argues that applying that standard this regulation is reasonably related to legitimate penological interests. If that were the test applicable to this case we would agree. Certainly this regulation will assist in the administration of the prisons and assist the Parole Board in making its decisions. However, as Judge (now Supreme Court Justice) Kennedy writes in Spain v. Procunier, 600 F.2d 189, 193-194 (9th Cir.1979):
... enforcement of the eighth amendment is not always consistent with allowing complete deference to all administrative determinations by prison officials. Whatever rights one may lose at the prison gates, cf. Jones v. North Carolina Prisoners Union (prisoners have no right to unionize), the full protections of the eighth amendment most certainly remain in force. The whole point of the amendment is to protect persons convicted of crimes. Eighth amendment protections are not forfeited by one's prior acts.
Since the regulations may violate the prisoners' eighth amendment right to adequate psychological care, as the public advocate argues, the cases of Jones, Turner and O'Lone are not applicable.
As the public advocate notes, in his policy directive the Commissioner has said:
The need to allow disclosure is based in part on the Department of Correction's statutory responsibility to protect the public, to safeguard both inmates and staff in the institutions, and on the fact that the primary client in this clinical practitioner/inmate relationship is the employer  Department of Corrections. [Emphasis supplied.]
This policy statement was the genesis of the new rule and is apparently the misconception upon which the Commissioner's rules are based. As noted by Dr. Patricia Brady, a psychologist and Director of Professional and Scientific Affairs for NJPA, in her testimony before the hearing officer of DOC on September 9, 1986 in support of the objection by NJPA, the psychologist's primary concern is the patient and the confidentiality of his or her confidences. Moreover, while the therapist obviously has certain administrative duties to the employer, these duties provide no basis for the DOC's imposition of a diluted standard of care for therapists' treatment of prisoners. *262 The definition of adequate medical care does not hinge on who is paying the bills. See generally City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 245, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605, 612 (1983). The Court in Taylor v. United States, 222 F.2d 398, 401 (D.C. Cir.1955), explained the role of the psychiatrist:
The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist, not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most persons who undergo a psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition.... It would be too much to expect them to do so if they knew that all they say  and all that the psychiatrist learns from what they say  may be revealed to the whole world from the witness stand.
Applying these comments to the prison setting it is obvious that the patient seeking help, or in the case of a sex offender committed to the Adult Diagnostic & Treatment Center such as Fitzgerald, who is required to undergo a program of specialized treatment for his mental condition under N.J.S.A. 2C:47-3, would be fearful if information disclosed by him to his clinical practitioner will be revealed to prison authorities.
In its brief and at oral argument DOC says it has every intention of providing full psychological services for inmates.[4] DOC further intends to require that communications between and among the clinical practitioners and individuals or groups in the course of practice are privileged, but that in situations which present a clear and imminent danger to the inmate or others the confidential nature of the communications will give way. Accepting that position of DOC, it is obvious that this result can be obtained by retention of paragraphs (a) and (c), subsections 1, 2 and 4, and striking the remainder of N.J.A.C. 10A:16-4.4.
The Appellate Division has the right "to review final decisions or actions of any State administrative agency or *263 officer, and to review the validity of any rule promulgated by such agency or officer ..." under R. 2:2-3. Administrative rules have in their support the rebuttable presumption of validity if they come within the ambit of delegated authority, as these regulations do. However, we are satisfied that the presumption of validity has been overcome in this case as to some portions of N.J.A.C. 10A:16-4.4. See Cole Nat. Corp. v. State Bd. of Examiners, 57 N.J. 227, 231 (1970). As to those portions we have elected to perform so-called "judicial pruning" by excising those portions and leaving the remaining rule intact. See Bor. of Collingswood v. Ringgold, 66 N.J. 350, 357 (1975), app. dism. 426 U.S. 901, 96 S.Ct. 2220, 48 L.Ed.2d 826 (1976).
Section (b) and subsections 3 and 5 of section (c) of N.J.A.C. 10A:16-4.4 are stricken,[5] but the remainder of the regulation shall remain in full force and effect.
NOTES
[1] The portion of the administrative regulations objected to was originally adopted as a treatment staff directive in the Adult Diagnostic & Treatment Center effective April 23, 1979. Its scope of applicability was widened by a policy directive of the Commissioner dated March 6, 1986. On April 18, 1986, the policy directive was reissued to limit the exceptions to confidentiality to situations "which present a clear and imminent danger to the inmate or others." It also defined the term "clinical practitioner" as "licensed psychologists, psychiatrists and unlicensed psychologists performing individual and or group therapy in state correctional institutions or satellite units." This policy directive became Standard 520.5 on April 30, 1986 and was revised on November 24, 1986 to provide that Form 520-I not be given to inmates upon entry into the prison system, but rather when the inmate enters therapy. The form itself was revised for clarity.
[2] Although the public advocate objects to (c)4, no argument is directed to it.
[3] Leave to appeal from the trial judge's decision in McIntosh v. Milano, was denied by us on July 19, 1979, and we understand the trial resulted in a verdict in favor of the defendant from which no appeal was taken.
[4] This recognizes the potential long-range benefit to the public interest by successful counseling.
[5] By striking these sections we do not intend to suggest that, if drug trafficking or a past crime of an inmate comes to the attention of the clinical practitioner which does present a clear and imminent danger to the inmate or other identifiable persons, such confidential information may not properly be disclosed.