**Edgar RIVERA and Elizabeth Pacheco, Plaintiffs,**

v.

**NEW YORK CITY HEALTH & HOSPITALS CORPORATION, et al., Defendants.**

**Edgar Rivera, Plaintiff,**

v.

**United States of America, Defendant.**

**Nos. 00 Civ. 5279(DC), 01 Civ. 2838(DC).**

United States District Court, S.D. New York.

March 26, 2002.

414

Levine & Grossman, by Michael A. Santo, Mineola, NY, for Plaintiffs.

Gordon & Silber, P.C., by Lawrence S. Wasserman, New York City, for Citiview Connections.

Gallagher, Walker & Bianco, by Robert J. Walker, Mineola, NY, for Fort Washington Men's Shelter.

Michael Cardozo, Corporation Counsel for the City of New York, by Matthew J. Moriana, Asst. Corporation Counsel, New York City, for HHC and City of New York.

Martin, Clearwater & Bell, by Gregory J. Radomisli, New York City, for New York Presbyterian Hospital and Dr. Bonard Moise.

James Comey, U.S. Atty. Southern District of New York, by Ross E. Morrison, Asst. U.S. Atty., New York City, for U.S.

## OPINION

CHIN, District Judge.

On April 28, 1999, at the 51st Street Lexington Avenue subway station, Julio Perez pushed plaintiff Edgar Rivera onto the subway tracks in front of an oncoming train. Rivera lost both legs. Perez was homeless and mentally ill; at the time he was receiving medical care or other assistance from three medical facilities and two homeless shelters.

In these cases, Rivera and his common-law wife, Elizabeth Pacheco, sue the health care providers and homeless shelters for Rivera's personal injuries and other losses, contending that defendants were negligent in failing to protect the public from Perez. Defendants move to dismiss or, in the case of two defendants, for summary judgment, arguing that they owed no duty to protect Rivera and other members of the public from Perez. For the reasons set forth below, the motions of the medical provider defendants are denied, and the motions of the homeless shelter defendants are granted.

## BACKGROUND

### I. The Facts

As alleged in the complaints, the facts are as follows: On April 28, 1999, Rivera was on the platform at the 51st Street Lexington Avenue subway station when Perez pushed him into the path of an oncoming subway train. (Compl. I at ¶¶ 8, 11).[1] As a result, Rivera suffered severe injuries and he required extensive medical treatment. (Id. at ¶ 15).

Perez was a diagnosed paranoid schizophrenic who showed violent tendencies, had a known history of violence, and did not take his medications. (Id. at ¶¶ 44–46, 50–51). During 1999, defendant New York City Health and Hospitals Corporation

(the "HHC") provided Perez with medical and psychiatric services at Bellevue Hospital and Elmhurst Hospital Center. (Id. at ¶¶ 18, 20–21). Defendants New York Presbyterian Hospital–Columbia Presbyterian Campus ("Presbyterian"), Dr. Bonard Moise, and the United States (through the Veterans Administration (the "V.A.")) also provided plaintiff with medical and psychiatric services. (Id. at ¶¶ 26, 30–39; Compl. II at ¶¶ 8–12). Plaintiffs allege that a V.A. doctor saw Perez at the V.A. Hospital in Manhattan on the morning of the incident and permitted him to leave "despite the fact that Mr. Julio Perez, upon information and belief, was under the impression that 'people were out to get [him].'" (Compl. II at ¶¶ 12–13). Criminal charges were brought against Perez, and in October, 2000, he was convicted of attempted murder and assault in New York Supreme Court, New York County.

Plaintiffs allege that the HHC, Presbyterian, Moise, and the V.A. were "negligent and careless in the medical and psychiatric treatment rendered to Julio Perez." (Compl. I at ¶ 53; Compl. II at ¶ 16). Specifically, plaintiffs allege that the medical provider defendants were negligent and careless in:

> failing to practice according to generally accepted medical and psychiatric standards;
>
> failing to heed the danger that Perez posed to himself and the general public;
>
> failing to provide Perez with proper and adequate mental health care, drug treatment therapy, or clinical supervision;
>
> failing to "hold" Perez involuntarily in light of his medical history and condition;
>
> failing to take steps to protect the public from Perez;

---

1. References to "Compl. I" are to the complaint filed in action no. 00 Civ. 5279. References to "Compl. II" are to the complaint filed in action no. 01 Civ. 2838.

failing to provide sufficient post-discharge planning and proper out-patient care; and

failing to insure that Perez took proper medication.

(*See* Compl. I at ¶ 53; Compl. II at ¶ 15).

From approximately April 1998 through April 28, 1999, Perez purportedly resided at two homeless shelters, defendants Fort Washington Men's Shelter ("Fort Washington") and Citiview Connections ("Citiview"). (Compl. I. at ¶¶ 69, 70).[2] During that time, and especially just before the incident, Perez was aggressive and violent toward other residents. (*Id.* at ¶ 71).

Plaintiffs contend that, in light of Perez's violent behavior during the weeks preceding the accident, "the [shelter] defendants knew or should have known that Julio Perez was a danger to others." (*Id.* at 71). Plaintiffs also allege that Fort Washington and Citiview "owed a duty to other 'third' parties ... to supervise, control and otherwise restrain Julio Perez" yet "failed to intervene in a reasonable fashion; failed to make any attempts to supervise or control Julio Perez in any manner ... [and] ... failed to warn any other agency, treating medical facility or other treating physicians about Julio Perez' behavior." (*Id.*).

## II. *Prior Proceedings*

Plaintiffs filed suit in May 2000 in New York Supreme Court, Bronx County, against defendants HHC, Presbyterian, Moise, Fort Washington, Citiview, the New York City Transit Authority ("NYC-

TA"), the City of New York (the "City"), and Dr. Arnaldo Gonzalez. The case was removed to this Court on July 7, 2000 because Gonzalez was a V.A. doctor and thus the claim against him was effectively a claim against the United States. By stipulation so ordered on July 24, 2000, the claims against Gonzalez were dismissed without prejudice to plaintiffs' right to re-file against the United States after complying with the requirements of the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 2671 *et seq.*

After Rivera exhausted his administrative remedies as required by the FTCA, he commenced the second of these actions against the United States. The first case was removed from the Court's suspense docket and restored to active status.

These *motions* followed. HHC, Presbyterian, Moise, the United States, the City, and Citiview moved to dismiss, and NYC-TA and Fort Washington moved for summary judgment. On February 5, 2002, I heard oral argument. Ruling from the bench, I granted the motions of City and NYCTA, dismissing the claims against them. I reserved decision as to the claims against the remaining defendants.[3]

### *DISCUSSION*

The principal issue presented is whether defendants, as mental health care providers and homeless shelters, owed a duty to Rivera and other members of the public to use reasonable care to ensure that Perez did not harm others. Specifically, defendants argue that a bright-line rule exists: They contend that providers of health care

---

**2.** Citiview denies that Perez "resided" there and contends that it is not a residential facility, but a "voluntary day program." (Wood Aff. at ¶¶ 5, 8).

**3.** In their memorandum of law opposing the motions to dismiss, plaintiffs concede that under New York law a plaintiff may not assert

a derivative claim based on injuries suffered by another unless the two are married. It is undisputed that Pacheco was not married to Rivera on April 28, 1999. (Pl. Mem. at 17). Accordingly, Pacheco's claims are dismissed and the caption is hereby amended to delete her name as a plaintiff.

and other services for the mentally ill owe no duty of care to the general public arising from the care of an outpatient who is receiving treatment on a voluntary basis.

For the reasons that follow, I hold that no bright-line rule exists. Rather, the existence of a duty of care to the general public arising from the treatment of an outpatient turns on the facts. Here, accepting the allegations of the complaint as true for purposes of these motions, and drawing all reasonable inferences in his favor, I conclude that, as to the health care providers, Rivera has stated claims upon which relief may be granted and that therefore he is entitled to offer evidence in support of his claims. Accordingly, the motions of the health care providers are denied. As to the homeless shelters, although I conclude as well that no bright-line rule exists protecting all homeless shelters from liability for the actions of voluntary residents, I conclude that Rivera has failed to allege facts that would give rise to the existence of a duty on the part of the homeless shelter defendants here. Accordingly, their motions are granted.

First, I discuss the applicable law: (a) the general principles governing the duty of care in third-party failure to protect situations; (b) the duty of care owed by medical and psychiatric care providers in particular; (c) the distinctions in the duty of care arising from the treatment of inpatients and the treatment of outpatients; (d) the procedures available to health care providers in New York to control potentially dangerous mentally ill individuals; and (e) the case law on the duty of care owed by shelters. Second, I apply the various principles to the facts alleged in the complaints in these cases.

## I. *Applicable Law*

### A. *The Duty of Care*

To prevail on a claim of negligence under New York law,[4] a plaintiff must prove (1) a duty owed by the defendant to the plaintiff to use reasonable care, (2) breach of that duty by the defendant, and (3) injury to the plaintiff. *Pulka v. Edelman*, 40 N.Y.2d 781, 390 N.Y.S.2d 393, 394–95, 358 N.E.2d 1019 (1976); *see also Eiseman v. State*, 70 N.Y.2d 175, 518 N.Y.S.2d 608, 613–14, 511 N.E.2d 1128 (1987). In general, a defendant has no duty to control the conduct of a person to prevent him from causing harm to others. *See Wagshall v. Wagshall*, 148 A.D.2d 445, 538 N.Y.S.2d 597, 598 (2d Dep't 1989); *see also* Restatement (Second) of Torts §§ 314, 324(A) (1963–1964). In certain circumstances, however, the law does impose such a duty. For example, a special relationship may exist between the defendant and a third person such that the defendant is required to control the third person to protect others. *See Fay v. Assignment Am.*, 245 A.D.2d 783, 666 N.Y.S.2d 304, 306 (3d Dep't 1997).

The Restatement of Torts provides some guidance as to when a special relationship exists for these purposes. It states that a person has a duty to control the conduct of a third person if:

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315 (1963–1964). The master-servant, parent-child, and common carrier-passenger rela-

---

4. Under the FTCA, New York law governs the claims against the United States. *Metzen v. United States*, 19 F.3d 795, 807 (2d Cir.1994).

Hence, the actions of all the defendants are to be measured by New York law.

tionships have all been deemed "special" relationships in certain circumstances. *Id.* at § 314A.

■ The Restatement also provides that "one who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts at § 319 (1963–1964). New York courts adhere to these principles. *Purdy v. County of Westchester,* 72 N.Y.2d 1, 530 N.Y.S.2d 513, 516, 526 N.E.2d 4 (1988) (special relationship exists between defendant and third person when that third person's "actions expose plaintiff to harm such as would require the defendant to attempt to control the third person's conduct; or [there is] a relationship between the defendant and plaintiff requiring defendant to protect the plaintiff from the conduct of others").

■ The question of whether a defendant owes a duty to a plaintiff or the public at large is a question of law for the court. *See Purdy,* 530 N.Y.S.2d at 516, 526 N.E.2d 4 (citations omitted) ("The question of whether a member or group of society owes a duty of care to reasonably avoid injury to another is of course a question of law for the courts.").

**B.  Medical and Psychiatric Care Providers**

■ In general, medical doctors owe a duty of care to their patients and persons they knew or reasonably should have known were relying on them for services to the patient, but they do not owe a duty to the public at large. *See Rebollal v. Payne,* 145 A.D.2d 617, 536 N.Y.S.2d 147,

148 (2d Dep't 1988). The category of persons relying on a physician's services is narrowly construed, and physicians cannot be held liable for mistakes made in the course of treatment when the treatment has a proper medical foundation. *See Bell v. New York City Health & Hosps. Corp.,* 90 A.D.2d 270, 456 N.Y.S.2d 787, 794 (2d Dep't 1982) (citations omitted). A physician's duty "is to provide the level of care acceptable in the professional community in which he practices. He is not required to achieve success in every case and cannot be held liable for mere errors of professional judgment." *Schrempf v. State,* 66 N.Y.2d 289, 496 N.Y.S.2d 973, 977, 487 N.E.2d 883 (1985) (citations omitted).

■ The duty owed to third parties by a psychiatrist or mental health practitioner is somewhat different than that owed by a physician. A psychiatrist or mental health practitioner has the same general duty to exercise "professional judgment" and treat patients using a "proper medical foundation." *Bell,* 456 N.Y.S.2d at 794; *see also Smith v. Fishkill Health–Related Ctr.,* 169 A.D.2d 309, 572 N.Y.S.2d 762, 764 (3d Dep't 1991) (citation omitted) ("a mental health practitioner is not responsible for harm inflicted by a patient so long as the faulty treatment, if any, is at most an error in the exercise of professional judgment"), *appeal denied,* 78 N.Y.2d 864, 578 N.Y.S.2d 878, 586 N.E.2d 61 (1991). In the case of mental health practitioners, however, in certain circumstances this duty is owed not only to patients and the narrow category of individuals the physician could expect to be affected by the treatment, but to the outside public as well. *See Winters v. New York City Health & Hospitals Corp.,* 223 A.D.2d 405, 636 N.Y.S.2d 320 (1996); *see also Schrempf,* 496 N.Y.S.2d at 977, 487 N.E.2d 883.[5]

---

**5.** There is authority for the proposition that psychiatric diagnoses are discretionary functions exempted from the reach of the FTCA. *See, e.g., Abernathy v. United States,* 773 F.2d

184, 188 (8th Cir.1985) (citing *Fahey v. United States,* 153 F.Supp. 878, 886–87 (S.D.N.Y. 1957)); *see* 28 U.S.C. § 2860(a). These cases

The *Winters* and *Schrempf* decisions are instructive. In *Winters*, a hospital released a psychiatric patient who later killed a third party. Clearly, the hospital was mistaken in releasing the patient. The First Department affirmed a denial of summary judgment, holding that issues of fact existed as to whether the hospital's decision to release was based on an error in the exercise of professional medical judgment or whether the hospital had failed to make the inquiries that it should have made. 636 N.Y.S.2d at 320. The court noted:

> Given that a resident psychiatrist apparently failed to inquire into the nature of the patient's auditory hallucinations and the phrase the patient kept repeating to himself, it is not clear whether there was a careful psychiatric examination of the patient. Nor is it clear whether the patient's records from prior psychiatric hospitalizations at the same institution were read prior to the patient's release.

*Id.* at 321.

In *Schrempf*, the claimant's husband was killed by a mental patient who had been released from a State institution but was still receiving outpatient treatment at the facility. *Schrempf*, 496 N.Y.S.2d at 974, 487 N.E.2d 883. The trial court and the Fourth Department found the State liable for negligently failing to have the patient committed prior to the assault. The Court of Appeals reversed, holding that in cases where a patient is confined, "there is both a duty to the inmate to provide him with reasonable rehabilitational conditions under the circumstances and to the outside public to restrain the dangerous, or potentially dangerous, so that

they may not harm others." *Schrempf*, 496 N.Y.S.2d at 977, 487 N.E.2d 883 (quotation omitted). The court also observed that "the State has frequently been held liable for the consequences of its breach of duty to protect others from the acts of the mentally ill confined to State institutions." *Id.* (quotation and citations omitted). The court nonetheless reversed the finding of liability, concluding that the State's psychiatrists were not negligent, and that any errors they made were mistakes made in the course of exercising their professional judgment.

## C. *Inpatient and Outpatient Treatment*

Relying on *Schrempf* and other cases finding no liability in outpatient situations, defendants argue that a bright-line rule exists protecting mental health providers from liability for treating outpatients who later harm third parties. *See, e.g., Wagshall*, 538 N.Y.S.2d at 598 ("In a voluntary outpatient treatment setting, a defendant clinic has been held to have no duty to control its patient's conduct."). For the following reasons, I conclude, however, that no bright-line rule exists and that, in certain limited circumstances, a mental health provider may be liable for failing to control or commit a voluntary outpatient who later harms a member of the public.

First, New York has not adopted a bright-line rule. Defendants cite many cases in an effort to establish such a rule, but the cases they cite are fact-specific and turn on factors other than merely whether the patient was an outpatient or an inpatient. For example, in *Wagshall*, plaintiff and his wife received outpatient treatment

may no longer be valid, however, in light of the Supreme Court's more recent holding that for the discretionary function to apply, "the choice must be grounded in social, economic, or political policy or, more briefly, must represent a policy judgment." *United States v.* *Gaubert*, 499 U.S. 315, 335, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quotations omitted). The Government has not, in any event, sought to rely on the discretionary function exception.

from a counseling agency. 538 N.Y.S.2d at 598. Plaintiff's wife shot him seven to eight months after the treatment was terminated, and he sued, asserting that defendants were negligent in their treatment of him and his wife and in failing to detain his wife or warn him. The court held that the defendants owed plaintiff no duty, but it did so because the treatment had been terminated months before the shooting and the plaintiff was "well aware of his peril, having been attacked by his wife on prior occasions." *Id.* at 598.

Likewise, defendants' reliance on *Kolt v. United States*, No. 94 Civ. 0293E(H), 1996 WL 607098 (W.D.N.Y. Oct.2, 1996), is misplaced. There, a psychiatric outpatient shot and killed himself and his spouse. The husband had been treated at a V.A. hospital on both an outpatient and inpatient basis. The wife's estate sued the United States on the theory that the V.A. was negligent for failing to warn the wife of the risks presented by her husband. Citing *Wagshall*, the court granted summary judgment dismissing the complaint because the plaintiff "failed to create a genuine issue of fact as to whether any employee of the surviving defendant should have known that Thomas Kolt presented such a serious and imminent danger to his wife that a duty to warn her existed." *Id.* at 445, 538 N.Y.S.2d 597. The court noted that "there is no basis—beyond what she herself knew—for inferring that [Kolt] presented a serious risk of imminent harm to his wife." *Id.* Hence, the case turned on the absence of evidence that the V.A. should have known that the husband presented a serious risk to the wife.[6]

Second, substantial New York case law—including the decision of the Court of Appeals in *Schrempf*—supports the conclusion that health care providers may be liable to third parties in outpatient situations. Although it ultimately rejected the claim of negligence, the court in *Schrempf* held that because the patient in question "was a voluntary outpatient, the State's control over him, and *consequent duty to prevent him from harming others*, is more limited than in case involving persons confined to mental institutions." 496 N.Y.S.2d at 978, 487 N.E.2d 883 (emphasis added). Hence, even though the patient was an outpatient, the court recognized that the State had a duty, albeit a more limited one, to prevent him from harming others. The court reversed the finding of liability not because there was no duty, but because the evidence showed that the State had not breached its duty. The patient's outpatient status did not absolve the State of responsibility.

In *Webdale v. North General Hosp.*, No. 111310/99, slip op. (S.Ct. N.Y. Co. June 13, 2000), *appeal dismissed*, 287 A.D.2d 945, 734 N.Y.S.2d 527 (1st Dep't 2001), the court specifically recognized the existence of a duty in outpatient situations:

> Where the individual involved is a voluntary psychiatric outpatient, the institution's control over the patient, and thus its duty to prevent the patient from harming others, is more limited.... However, *the duty does not disappear*, and the institution may be held liable if the failure to place the patient on inpatient status resulted from something

---

6. Other decisions cited by defendants also turned on the facts, after the filing of summary judgment motions. *See Leifer–Woods v. Edwards*, 281 A.D.2d 462, 722 N.Y.S.2d 43 (2d Dep't 2001); *Adams v. Elgart*, 213 A.D.2d 436, 623 N.Y.S.2d 637 (2d Dep't 1995); *Rebollal v. Payne*, 145 A.D.2d 617, 536 N.Y.S.2d 147 (2d Dep't 1988); *Cartier v. Long Island College Hosp.*, 111 A.D.2d 894, 490 N.Y.S.2d 602 (2d Dep't 1985); *Knier v. Albany Med. Ctr. Hosp.*, 131 Misc.2d 414, 500 N.Y.S.2d 490 (N.Y.Sup.Ct.1986).

other than an exercise of professional judgment....

*Defendants' contention that there is no duty, as a matter of law, in the voluntary outpatient context, is simply erroneous* ..., as is the suggestion that the duty does not run to the public at large, but only in favor of the patient or the patient's relatives....

Slip op. at 5, 7 (citations omitted; emphasis added).

Third, there is substantial case law from other jurisdictions holding that, in certain circumstances, mental health care providers may have a duty to protect others from the actions of voluntary outpatients. The leading decision is still the California Supreme Court's decision in *Tarasoff v. Regents,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). There, a student at the University of California at Berkeley was killed by a voluntary outpatient who had told his psychologist of his intention to kill the student. *Id.* at 339–41. The court held that California law did not require the therapist to "render a perfect performance," but only the "reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of (that professional specialty) under similar circumstances." *Id.* at 345 (quotation and citations omitted). Nevertheless, the *Tarasoff* court held:

> Once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, *he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger.* While the discharge of this duty of due care will necessarily vary with the facts of each case, in each instance the adequacy of the therapist's conduct must be measured against the traditional neg-

ligence standard of the rendition of reasonable care under the circumstances. *Id.* at 345 (emphasis added).

Although *Tarasoff* involved a specifically identifiable victim, other courts have found a duty to all foreseeable victims, including members of the general public, and have permitted claims for a psychotherapist's negligent failure-to-warn and negligent failure-to-commit. *See, e.g., Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185, 194–95 (D.Neb.1980); *Shively v. Ken Crest Ctrs. for Exceptional Persons,* No. 966–05–316, 2001 WL 209910, \*5–6 (Del.Super.2001); *Estates of Morgan v. Fairfield Family Counseling Ctr.,* 77 Ohio St.3d 284, 673 N.E.2d 1311, 1324–26 (1997); *Hamman v. County of Maricopa,* 161 Ariz. 58, 775 P.2d 1122, 1128 (1989); *Schuster v. Altenberg,* 144 Wis.2d 223, 424 N.W.2d 159, 166 (1988); *McIntosh v. Milano,* 168 N.J.Super. 466, 403 A.2d 500, 511–12 (N.J.Super. Ct. Law Div.1979); *Schuster v. Altenberg,* 144 Wis.2d 223, 424 N.W.2d 159 (1988). *But see Sellers v. United States,* 870 F.2d 1098 (6th Cir.1989) (holding V.A. psychiatrist was not negligent in failing to warn general public of outpatient's potentially dangerous tendencies); *Currie v. United States,* 836 F.2d 209 (4th Cir.1987) (holding psychotherapist has no duty to seek involuntary commitment of patient believed to be dangerous to others).

Fourth, although the treatment of the mentally ill is a difficult and delicate task and important policy concerns are implicated by the imposition of liability on psychotherapists, the "significant policy considerations do not in any sense abrogate the psychiatrist's duty to rest his decision to release the patient upon a careful and competent examination." *Bell,* 456 N.Y.S.2d at 794. Indeed, as the Supreme Court of Wisconsin has held:

> [N]either the possible impact that limited intrusions upon confidentiality might

have upon psychotherapist-patient relations, nor the potential impact that the imposition of liability may have upon the medical community with respect to treatment decisions, warrants the certain preclusion of recovery in all cases by patients and by the victims of dangerous patients whose harm has resulted directly from the negligence of a psychotherapist.

*Schuster v. Altenberg,* 424 N.W.2d at 175.

For all of these reasons, I conclude that no bright-line rule exists and that the existence of a duty of care on the part of a mental health care provider to the general public arising from the treatment of an outpatient turns on the facts.

## D. *The Mental Hygiene Law*

A theme that runs through the cases addressing the liability of mental health care providers for the actions of their patients is the question of control—whether the psychotherapist has the ability to control the actions of a patient who presents a danger to others. New York law provides a variety of mechanisms by which a mental health provider can seek commitment, including commitment on an emergency basis, where an outpatient presents a significant and immediate threat to himself or others. These mechanisms also provide safeguards for the protection of the patient. New York Mental Hyg. Law, §§ 9.27, 9.33, 9.39, 9.40 (McKinney 1996 & Supp.2001–02).

For example, the director of a hospital "may receive and retain therein as a patient any person alleged to be mentally ill and in need of voluntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person." *Id.* at § 9.27. The application may be executed by a variety of individuals, including the person with whom the patient resides, his or her immediate family, an officer of "any

public or well recognized charitable institution or agency or home in whose institution the person alleged to be mentally ill resides," the director of community services of the city in which the patient resides, or the director of an alcohol treatment center. *Id.* at § 9.27(b)(1)-(8). To retain an involuntarily committed patient without his consent, the director must apply to the supreme court or county court in the county where the hospital is located for an order authorizing continued retention within 60 days. *Id.* at § 9.33(a).

The Mental Hygiene Law also provides safeguards for the involuntary commitment process; when a person is involuntarily committed the hospital director must provide written notice to the mental hygiene legal services as well as the nearest relative of the person alleged to be mentally ill and up to three additional persons designated by the patient. *Id.* at § 9.29. Within sixty days of involuntary admission the patient, any relative or friend, or the mental hygiene legal service may apply for a hearing before a court, and the hearing must be held within five days. *Id.* at § 9.31. In addition, the Mental Hygiene Law contains provisions for fifteen day and seventy-two hour emergency admissions. *Id.* at §§ 9.37, 9.39; *see also id.* at § 9.41. Notably, one section of the law imposes an express duty, as it provides that "all directors of community services, health officers, and social services officials . . . are charged with the duty of seeing that all mentally ill persons within their respective communities who are in need of care and treatment at a hospital are admitted to a hospital pursuant to the provisions of this article." *Id.* at § 9.47.

New York law thus establishes that mental health providers have a duty to their patients, they have a duty to third parties in certain circumstances, and they have mechanisms by which to seek to con-

trol patients, including outpatients, who are a threat to themselves or others.

### E. Homeless Shelters

Few cases address the liability of homeless shelters or similar facilities for injuries caused by residents to third parties. For the most part, the courts have found no liability, holding that shelters and halfway facilities lack the requisite control over residents to warrant the imposition of a duty of care to others. *See, e.g., Henry v. Bi–District Bd. of Urban Ministry, Inc.*, 54 S.W.3d 287 (Ct.App.Tenn.2001) (affirming dismissal of negligence claim by guest of homeless day shelter for injuries suffered when he was struck in head by another guest because shelter had no duty to provide security to protect plaintiff); *Metropolitan Dade Co. v. Dubon*, 780 So.2d 328, 328–30 (Dist.Ct.App.Fla.2001) (setting aside jury verdict in favor of resident of homeless shelter who sued after being stabbed by roommate, where shelter was "a non-profit, no-fee shelter for homeless men" that provided certain training and programs, and clients "were free to come and go as they pleased"; court noted the homeless shelter "did not have a common law duty to maintain a vigil over those who sought shelter"); *Lighthouse Mission of Orlando, Inc. v. Estate of McGowen*, 683 So.2d 1086 (Fla.Dist.Ct.App.1996) (setting aside jury verdict of $1.5 million in favor of parents of 11–year old girl who was raped and murdered by resident of home for transients and ex-convicts, where the resident was a voluntary tenant and could leave at will and the home had no right or ability to control the resident); *see also Akinwande v. City of New York*, 260 A.D.2d 586, 688 N.Y.S.2d 651 (2d Dep't 1999) (workers at city-owned homeless shelter could not recover for injuries sustained when attacked by unknown assailants at shelter on theory City failed to provide adequate security because "no special relationship" existed as required

where governmental function was implicated).

There are exceptions. In *Shively v. Ken Crest Centers for Exceptional Persons*, No. 96C–05–316, 2001 WL 209910 (Del.Super.Jan. 26, 2001), the court denied a motion for summary judgment in a case brought on behalf of an eight-year old boy who was sexually assaulted by a resident of a neighboring facility for the mentally impaired. Comparing the relationship between the facility and its residents to the relationship between a psychotherapist and his patient, the court concluded that the facility owed to plaintiffs a duty to take reasonable precautions to protect potential victims from its residents. *Id.* at *6. The court noted that factual issues existed for trial as to whether the facility knew or should have known of the dangerous propensities of the resident and whether it took reasonable steps to protect potential victims. *Id.* Significantly, the record contained evidence that the facility provided residents with "hands-on assistance, if needed, with respect to hygiene issues, personal finances, nutritional requirements and employment placement" and also arranged for "appropriate medical care and mental health counseling." *Id.* at *2. *See also Nova Univ., Inc. v. Wagner*, 491 So.2d 1116 (Fla.1986) (permitting negligence claim against operator of residential rehabilitation program for delinquent and emotionally disturbed children, where two juvenile residents who had exhibited propensity for violence ran away from facility and killed a small child and injured another, where facility had right to control and restrain its residents).

The general negligence principles discussed above, including the principles set forth in the Restatement (Second) of Torts, apply here as well. No bright-line rule protects homeless shelters from liability for negligence in failing to control residents who present a substantial threat to

others. As in the case of mental health providers, the existence of a duty turns on the facts—whether the homeless shelter has the ability to control its residents, whether it knows or should know that a resident poses a threat to others, and whether, if so, it takes reasonable steps to protect the potential victims.

## II. Application

Applying these principles to this case, I address first the mental health care providers and then the shelters.

### A. The Mental Health Care Providers

■■■ Rivera's claims against the mental health care providers cannot be dismissed unless "it appears beyond doubt that [he] can prove no set of facts in support of his claim which would entitle him to relief." *Nettis v. Levitt,* 241 F.3d 186, 191 (2d Cir.2001) (quotation omitted) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Hence, at this juncture the issue is not whether Rivera will ultimately prevail, but whether he has alleged sufficient facts such that he should be permitted to seek and offer evidence in support of his claims. *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999) (citing *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)). I conclude that he has.

The complaints here allege not just that the mental health care providers erred in the exercise of their professional judgment, but they allege that the medical defendants failed to conduct careful examinations and make considered decisions as

reasonably competent mental health practitioners. *See Amadon v. State,* 182 A.D.2d 955, 956, 582 N.Y.S.2d 539 (3d Dep't 1992) (mental health practitioners, like other physicians, may not be held liable for errors in medical judgment "if such judgment, even though erroneous, is exercised *after careful examination of the patient"*) (citations and quotation omitted) (emphasis added). The complaints allege that the mental health care providers knew that Perez presented "a danger and risk of harm to the general public" and that they nonetheless failed to "involuntarily 'hold' " him and otherwise take steps to protect the public from him. Moreover, the complaints allege that defendants treated Perez immediately before the incident; hence, this is not a situation as in to *Wagshall* where treatment had terminated months before. Indeed, Rivera alleges that the V.A. doctor saw Perez the very morning of the incident.

The fact that Perez was homeless may be significant. The mental health care providers here knew that Perez did not have a home to return to, and they knew or should have known that he probably did not have a network of friends and family who could support him. They also knew or should have known that he would be returning to the street where, as alleged in the complaints, he would present a threat to himself or others. These facts may impact on the reasonableness of defendants' actions and the existence of a duty.

Significantly, many of the cases denying liability were decided after discovery, either on summary judgment motions or at trial.[7] Here, Rivera has not yet had the

---

7. The New York cases finding against liability focus not on the patient's status, but on the type of examination performed on the patient, suggesting that there could be a treatment scenario that would give rise to liability. *See, e.g., Galuski v. State,* 188 A.D.2d 1006, 592 N.Y.S.2d 158 (4th Dep't 1992) (holding that after "lengthy trial," trial court correctly de-

termined that State breached no duty by releasing an individual from involuntary commitment who attacked claimant three weeks later; "overwhelming evidence" indicated that patient did not exhibit "any psychotic behavior during his involuntary commitment"); *Smith v. Fishkill Health–Related Center,* 169 A.D.2d 309, 572 N.Y.S.2d 762, 764–

opportunity to conduct discovery. It is not clear, for example, whether defendants considered any of the involuntary commitment procedures available under the Mental Hygiene Law or whether defendants had any ability to "control" Perez.

Certainly, "psychiatrists are not required to be omniscient when diagnosing dangerousness." Sherrie A. Wolfe, *The Scope of a Psychiatrist's Duty To Third Persons: The Protective Privilege Ends Where the Public Peril Begins*, 59 Notre Dame L.Rev. 770, 776 (1984). In this case, the determination not to seek the involuntary commitment of Perez might well have been "a considered medical judgment for which defendants cannot be held liable." *Scialdone v. State*, 197 A.D.2d 568, 602 N.Y.S.2d 638 (1993). At this point, however, it is impossible to tell. Accordingly, the mental health providers' motions to dismiss are denied.

### B. *The Homeless Shelters*

As for the shelters, Rivera alleges that Perez was a "resident" at defendants Fort Washington and Citiview "from at least in or about April 1998 up to and including the date of the accident, April 28, 1999." (Verified Compl. at ¶¶ 69–70). Rivera does not allege that the shelters provided Perez with psychiatric care. (Pl. Mem. at 6). Fort Washington moves for summary judgment, but because summary judgment is usually granted only if the nonmoving party fails to meet his burden of proof after discovery and Rivera has not yet had an opportunity to conduct discovery, I treat the motion as if it were a Rule 12(b)(6) motion. *Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000). Citiview moves to dismiss, but it submits evidentiary materials outside the pleadings. I decline to convert the

motion to dismiss to a summary judgment motion and thus I will not consider the extrinsic materials. *See Fonte v. Bd. of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (1988); *see generally* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1366 (1990).

■■■ Rivera's complaint against Citiview and Fort Washington fails to allege any facts that would give rise to a duty of care to the general public. The complaint merely alleges that Perez was a resident at the facilities, that he exhibited violent propensities while he was there, and that the shelters failed to control or restrain him or to warn others about him. The complaint fails to allege, however, any facts that would suggest that the shelters had any ability to control Perez. The complaint does not indicate, for example, whether the facilities merely provided Perez with a bed and a place to sleep (if they did so at all) or whether they did more; it does not indicate whether Perez was free "to come and go"; it does not indicate whether Perez was receiving any counseling or psychiatric care at the facilities; and it does not indicate whether the facilities had standing to seek to involuntarily commit Perez pursuant to the Mental Hygiene Law and, if so, whether they were negligent in failing to do so.

Accordingly, the complaint fails to state a claim against Fort Washington and Citiview upon which relief may be granted; their motions are therefore granted and the claims against them are dismissed.

### *CONCLUSION*

For the reasons set forth above, the motions to dismiss of HHC, Presbyterian, Moise, and the United States are denied. The motions of Fort Washington and Citi-

65 (3d Dep't 1991) (affirming grant of summary judgment where proof was submitted detailing defendants' exercise of professional

judgment); *Davitt v. State*, 157 A.D.2d 703, 549 N.Y.S.2d 803, 804 (2d Dep't 1990).

view are granted, but Rivera may re-plead his claims against the shelters; if he wishes to do so, he must file an amended complaint within 30 days. Of course, the amended complaint must comply with the requirements of Rule 11 and Rivera and his counsel shall take into account the evidentiary materials submitted by the shelters.

The parties shall appear for a pre-trial conference on May 10, 2002, at 11 a.m. If Rivera re-pleads as to the shelters, their counsel shall attend the conference as well. SO ORDERED.