[21 NYS3d 53]

ANTHONY ODDO, Respondent, v QUEENS VILLAGE COMMITTEE
FOR MENTAL HEALTH FOR JAMAICA COMMUNITY ADOLESCENT
PROGRAM, INC., Appellant.

First Department, December 3, 2015

---

**APPEARANCES OF COUNSEL**

*Marshall Conway & Bradley, P.C.*, New York City (*Jeffrey A. Marshall* and *Amy S. Weissman* of counsel), for appellant.

*Burns & Harris*, New York City (*Christopher J. Donadio, Blake G. Goldfarb* and *Judith F. Stempler* of counsel), for respondent.

**OPINION OF THE COURT**

SWEENY, J.

The issue before us is whether a residential substance abuse treatment facility owes a duty of care to a third party against whom one of its residents commits a violent act after his termination from its program. Under the facts of this case, we conclude that it does and that there are material questions of fact as to whether defendant properly discharged that duty. At approximately 10:00 p.m. on July 17, 2010, plaintiff was stabbed in the right shoulder by nonparty Sean Velentzas. Shortly before the incident, Velentzas had been a patient living in a drug treatment facility operated by Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc. (JCAP or Queens Village). He had been sent to the facility under the TASC* program as an alternative to incarceration for charges stemming from allegations that he had robbed a cab driver at gunpoint.

After the completion of discovery, defendant moved for summary judgment dismissing plaintiff's complaint on the ground that it owed plaintiff no duty since Velentzas was properly discharged from its facility for violations of its policy against violence and alcohol use.

Ricky Cottingham, the Acting Clinical Program Director of Queens Village, testified at his deposition that he never worked

---

\* TASC (Treatment Alternatives for Safer Communities) is an alternative-to-incarceration program which, with the consent of the District Attorney and the court, contracts with agencies such as JCAP to provide substance abuse and mental health treatment services to criminal defendants in lieu of going to prison.

with Velentzas directly, and did not know when Velentzas began treating at the facility or whether he had been referred by a criminal court. He acknowledged that Queens Village accepts referrals from the criminal courts. Cottingham explained that the program is considered as an alternative to incarceration and that a resident's sentencing does not take place until he or she actually completes the program. He also testified that participants at Queens Village are not free to leave the facility at any time but must obtain staff approval to do so. Residents are allowed to leave the facility to attend medical and court appointments or to go on nature walks or trips, but, on those occasions, the resident is escorted by a facility employee. However, Cottingham also testified that "no one can physically control anyone entering or leaving the building" and that a resident can leave the program against clinical advice. When a resident is discharged from the program for violating a rule, or leaves against clinical advice, the entity that referred him or her to Queens Village is contacted. If the agency is a probation or parole agency, someone from the agency comes to pick up the discharged resident. If it was a TASC referral, the typical procedure is for the resident to report to TASC the next business day following his or her dismissal from the program.

Defendant also submitted an affidavit by Cottingham in support of its motion. In the affidavit, Cottingham stated that he was not working on July 17, 2010, the date of the incident, but was informed by his employees as to what occurred on that date. He was advised that at approximately 9:30 p.m., Velentzas was told by Queens Village staff that he was being dismissed from the program because he had violated a "cardinal rule" by pushing another resident to the ground. Velentzas was also questioned about having consumed alcohol and, although he refused to take a breathalyzer test, he admitted drinking alcohol. Since these incidents occurred during a weekend, defendant's employees began to fill out the necessary paperwork to transfer Velentzas to Faith Mission Crisis Center, an intermediary facility, where, according to Cottingham, he would "be held until he could report to TASC." However, during this process, Velentzas "became enraged and was acting out of control." Queens Village employees followed facility protocol and called 911. When the police arrived, Velentzas was, in Cottingham's words, "escorted . . . off the premises." The incident report prepared by Queens Village staff and submitted in support of its motion for summary judgment also stated that Va-

lentzas "was escorted by police officers off the property." There is no indication in the record on appeal that Velentzas was ever taken into custody by the police, or that Queens Village staff advised the police that he needed to be held or taken to Faith Mission pending notification to TASC. Velentzas was released by the police shortly after his removal from Queens Village property. His attack on plaintiff took place approximately a half hour after he was escorted off the premises.

Significantly, in his affidavit, Cottingham stated that Queens Village "was under the impression that Mr. Velentzas would be taken to the police station until such time as his probation officer and TASC officer were notified of the situation." He further stated that "[a]t no time did [Queens Village] release Mr. Velentzas into the general public, nor did [it] have intention of same." In its motion, Queens Village took the position that it owed no duty of care to plaintiff and that, while its employees did not advise the police that Velentzas should be taken to Faith Mission or held until TASC could be advised of his dismissal from the program, in light of the fact that it is "a treatment facility where individuals reside in lieu of going to prison, there is no doubt that the New York City Police Department is aware of the potential behavior of such residents." Finally, Queens Village maintained that it did not release Velentzas into the general public but rather released him into police custody.

The motion court denied defendant's motion. It found that defendant did not present "a scintilla of evidence that Velentzas was ever in police custody," and that "[n]o one with personal knowledge of the facts proffered any sworn testimony" or any documentary evidence such as a police report in support of defendant's contention that Velentzas was taken into custody by the police. Finally, the court concluded that, from all the facts presented, defendant "had the necessary authority, or ability, to exercise such control over Valentzas' [sic] conduct so as to give rise to the duty on their part to protect a member of the general public."

The dissent posits that, in this case, since the facility had the right to discharge its residents for rule violations, it had no duty to protect the general public from a discharged resident's subsequent violent acts. In the alternative, to the extent such a duty existed, the dissent contends that it was properly discharged when Velentzas was turned over to the police. For the following reasons, we do not agree.

For a party to prevail on a cause of action for common-law negligence, "it must be shown that the defendant owes a duty to the plaintiff" (*Pulka v Edelman*, 40 NY2d 781, 782 [1976]). The question of whether someone owes a duty of care to reasonably avoid injury to another is a question of law (*see Purdy v Public Adm'r of County of Westchester*, 72 NY2d 1, 8 [1988]). Generally, the common law does not impose a duty to control the conduct of third persons to prevent them from causing injury to others; rather, liability for the negligent acts of third persons arises "when the defendant has authority to control the actions of such third persons" (*Ramsammy v City of New York*, 216 AD2d 234, 236 [1st Dept 1995], *lv dismissed in part, denied in part* 87 NY2d 894 [1995], quoting *Purdy*, 72 NY2d at 8).

With respect to mental health care providers, New York has "no bright-line rule" regarding whether those individuals or facilities "treating a patient on a voluntary basis owe[ ] a duty of care to the general public. Instead, the courts have examined the issue on a case-by-case basis" and the existence of such a duty turns on the facts of a particular case (*Fox v Marshall*, 88 AD3d 131, 136 [2d Dept 2011] [internal citation omitted]; *Rivera v New York City Health & Hosps. Corp.*, 191 F Supp 2d 412, 419 [SD NY 2002]).

Applying these principles to the facts of this case, we find that the motion court correctly denied Queens Village's motion, because Queens Village failed to meet its initial burden of establishing, as a matter of law, that it owed no duty of care to plaintiff (*Fox v Marshall*, 88 AD3d at 135).

The key factor in determining whether a defendant will be liable for the negligent acts of third persons is whether the defendant has sufficient authority to control the actions of such third persons (*Purdy*, 72 NY2d at 8). Such authority, at a minimum, requires "an existing relationship between the defendant and the third person over whom 'charge' is asserted" (*D'Amico v Christie*, 71 NY2d 76, 89 [1987]).

There is no question that Queens Village had "an existing relationship" and sufficient authority to control Velentzas's actions. The dissent correctly observes that residents of this facility "are not prisoners." However, that degree of authority or control is not required to meet the standard of authority set forth in the case law on this issue (*see D'Amico v Christie*, 71 NY2d 76 [1987]). Cottingham testified unequivocally that residents were not free to leave the facility without permission

and without an escort. While a resident could leave against clinical advice, the result would be a termination of the program, notification to the referring agency and criminal court that sent the resident to Queens Village, and the resident's return to the criminal justice system. Notably, before the police were called, Queens Village employees were preparing paperwork to have Velentzas transferred to an interim facility where he was, in Cottingham's words, to be "held until TASC could be notified." This certainly indicates the type of control Queens Village had over him by virtue of his referral from a criminal court and is sufficient to meet the requirement of authority or control with respect to establishing a duty of care on the part of defendant.

More importantly, in his affidavit Cottingham tacitly, if not explicitly, recognized Queens Village's duty of care by acknowledging that there was no intention on the part of Queens Village to release Velentzas into the general public. Cottingham asserted, rather, that Velentzas was released into police "custody." The dissent mischaracterizes our reference to this "statement of intent." This acknowledgment does not, as the dissent contends, "create[ ]" a duty of care; it merely indicates that defendant was aware that it had such a duty.

In its motion, defendant submitted no affidavits or depositions from anyone with direct knowledge as to what transpired when Velentzas was advised that he was terminated from the program, or what information was communicated to the police concerning his status vis-à-vis his pending criminal case. No documentary or other evidence was submitted to support defendant's allegations that Velentzas was, in fact, taken into custody, or that the police had any obligation to either hold Velentzas "[at] the police station," as Cottingham stated, or transport him to Faith Mission, other than a passing, unsupported reference in defendant's counsel's reply affirmation that, since defendant's facility houses individuals for treatment in lieu of prison, "there is no doubt that the New York City Police Department is aware of the potential behavior of such residents." Even assuming that statement is correct, Queens Village submitted nothing in support of its contention that the police could have, and should have, held Velentzas until TASC was notified. As noted, Cottingham testified and the incident report completed by Queens Village employees state specifically that Velentzas was "escorted" off the facility property, a far different situation than being taken into police "custody."

It is axiomatic that "the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). "Failure to make such prima facie showing requires a denial of the motion, regardless of the sufficiency of the opposing papers" (*id.*). Contrary to the conclusion of our dissenting colleague, we find that Queens Village did not meet its burden of demonstrating that it had no duty of care.

The dissent argues that cases such as *Purdy, Eiseman, Pulka, D'Amico*, and *Ramsammy* fail to support our conclusion that in this case, Queens Village owed a duty of care to plaintiff or to members of the general public. While it is true that in those cases the courts found no duty existed on the part of the defendants for the actions of the third parties, the principles as to when and under what circumstances such liability may arise are certainly applicable here. Indeed, in each of those cases, the court utilized the same legal principles as we cite herein and applied them to the particular facts of the case. In this case, our analysis turns, as did the analysis in those cases, on the specific facts on the record before the court.

For example, the critical element of control of the third party by the defendant, clearly present in this case, is notably absent in each of the above-cited cases. We note that in *Fox* (88 AD3d at 137), the element of control was established because the third party therein "appeared to need a facility-issued pass" to leave the facility, not unlike the situation here. While it is true that *Fox* was decided in the context of a CPLR 3211 (a) (7) motion rather than a summary judgment motion, that fact does not negate the well established principle of law concerning the need to demonstrate control by the defendant over the third party to establish a duty to others.

Moreover, unlike the dissent, we cannot say, on this record, that even if there were a duty owed by Queens Village, it was extinguished when Velentzas was turned over to the police. The dissent conflates our observations on this issue with defendant's argument on appeal that it discharged any duty it may have had by turning Velentzas over to police "custody." We take no issue with the dissent's observation that "[a] private drug treatment facility simply cannot control what the police do." We make no suggestion that it had any obligation, as the dissent posits, to ensure that the police kept Velentzas in

custody. We simply observe that, based on the evidence submitted, there is no proof, documentary or otherwise, from anyone present at the time of the incident that the police ever took Velentzas into "custody," thereby extinguishing any further duty on defendant's part. At this stage of the proceedings, the record presents a material question of fact on this issue.

Since defendant failed to meet its initial burden to show that it owed plaintiff no duty of care (*see Fox v Marshall*, 88 AD3d at 135), we need not reach the issue of the sufficiency of plaintiff's opposition papers (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985]). The motion for summary judgment was therefore correctly denied.

Accordingly, the order of the Supreme Court, Bronx County (Norma Ruiz, J.), entered February 25, 2014, which denied defendant's motion for summary judgment dismissing the complaint, should be affirmed, without costs.

SAXE, J. (dissenting). A residential drug treatment facility, as an alternative to incarceration, may discharge its residents at any time for rule violations. Residents there are not prisoners, and may simply leave the facility at will—although if they leave without permission they may lose the privilege of receiving an alternative to incarceration. It is through this lens that the circumstances of this appeal must be understood. From these two essential facts, it follows as a rule of law and a statement of common sense that these facilities cannot properly be saddled with a duty to protect the general public from a discharged resident on the theory that he may possibly become violent toward some unknown third party after leaving the facility. Moreover, even if any such duty existed in law, it would be fulfilled when that resident was turned over to police custody; the facility has neither the right nor the obligation to ensure that the police thereafter prevent the resident's release.

On July 17, 2010, at approximately 10:00 p.m., plaintiff, Anthony Oddo, was punched and stabbed in the shoulder by Sean Velentzas, the son of the woman he was then dating. Just a few weeks earlier, Velentzas had been admitted, as an alternative to incarceration under the TASC (Treatment Alternatives for Safer Communities) program, to a residential drug treatment facility run by defendant, Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc. However, on the day of the incident, he had been expelled from the facility for pushing another resident to the ground and consuming alcoholic beverages on the premises in violation of facility rules.

Because Velentzas's discharge involved a physical assault, defendant's employees began to fill out paperwork to transfer Velentzas to Faith Mission, a program used as an intermediary location where a discharged resident can be held until TASC can be notified. However, when Velentzas became enraged and began acting out while the paperwork was being completed, the police were called to the facility, and Velentzas was escorted off the premises by the police. The police released Velentzas shortly after escorting him out of defendant's facility, and he made his way to his grandmother's residence, where his attack on plaintiff took place.

Plaintiff's theory of liability is that the facility negligently discharged Velentzas in a manner that failed to ensure that he would remain in custody, even though it knew or should have known that he was prone to violent conduct.

Defendant moved for summary judgment dismissing the complaint on the ground that it owed no duty to plaintiff, as a member of the general public. I would grant that motion.

In support of the motion, defendant's Acting Clinical Program Director explained that when a patient is discharged for violating a rule, the entity that made the reference is contacted. Some agencies, such as probation or parole, send someone to pick up the discharged resident. However, he explained, other referring agencies do not arrange for a pick-up of the discharged person; the individual is simply instructed to report to the agency the following business day. In particular, residents who had been referred by TASC would be instructed to report to TASC the next business day following dismissal from the program. Further support for the motion is provided by a notice given to defendant's program by Queens TASC that indicates that it is possible for a participant to simply leave, against clinical advice, and confirms TASC's expectation that the program's obligation is limited to notifying TASC if a resident is discharged: "Any change by way of the client leaving against clinical advice or being discharged for any reason, should be brought to the attention of TASC immediately via telephone followed by written confirmation. TASC will in turn notify all criminal justice agencies involved."

The majority holds that because Velentzas was residing at the facility as an alternative to incarceration, and because defendant's employees knew that Velentzas could be violent, they had a duty to instruct the police that Velentzas must not be released into the general public, and to ensure that he was

taken to the Faith Mission Crisis Center. The majority takes issue with the facility's offered proof regarding exactly what was communicated to the police, indicating that defendant had the burden to prove that it ensured that Velentzas was taken into custody and held until he could be turned over to Faith Mission, and failed to make that showing. But, the facility was under no such obligation.

The majority's analysis relies on the distinction between the police taking a person "into custody," as opposed to removing him from the site where he was causing trouble and then releasing him rather than arresting and booking him. The majority holds that it was the duty of the defendant facility to ensure that its discharged resident be taken into and remain in custody until such time as he could be turned over to the Faith Mission program to be held until TASC could take custody of him.

However, the police were summoned through a 911 call, a measure any such facility is entitled—and perhaps well advised—to take if a resident threatens or engages in aggression towards others. Once the police arrive in response to such an emergency call, it is they who have the sole discretion regarding how to handle the individual whose conduct prompted the call. A private drug treatment facility simply cannot control what the police do. It has no authority to instruct the police as to how to handle its discharged resident. It lacks any power to ensure that the police take an unruly discharged former resident into custody or hold him until another facility claims him.

Yet, the majority goes even further than imposing on the defendant facility an obligation to instruct the police as to how to handle a resident whose conduct prompted a 911 call; the obligation it imposes logically survives past the removal of that resident by the police, so that no matter how the police handle that resident initially, if the police later decide to release him, the facility will still be liable for any harm he does. The unreasonableness of such an obligation should be apparent, since the responding officers have a number of options, from deciding not to arrest the individual at all, to arresting him but releasing him, to arresting him, booking him, and leaving it to the arraignment court to decide how to handle him. The observation that the police did not take Velentzas into custody does not justify holding the defendant facility liable; once the police took Velentzas, he was under their control and authority, and the facility had no further duty or ability to control him.

Indeed, a rule that a drug treatment facility has an obligation to instruct the police that a discharged resident must remain in custody, and may not be released to the public, cannot succeed at its intended impact; it would be, in effect, an illusory obligation. The facility cannot ensure that a discharged resident will be taken into or retained in custody, since the police have no obligation to abide by the instructions of a private facility.

Even if defendant facility gave the respondent officers the exact instructions the majority requires, the police would not be liable to an injured third party for failing to abide by such instructions, absent a special relationship with the injured individual (*see De Long v County of Erie*, 60 NY2d 296 [1983]). Therefore, the only practical value of creating such a legal duty is not really to protect the public, but simply to provide injured third parties with an entity that can be sued. That is the true impact of the majority's ruling here.

The majority attempts to buttress its assertion that the facility has a duty to prevent a discharged resident's release by referring to a statement by the facility's Acting Clinical Program Director that it had no intention to release Velentzas into the general public. This is wrong; a private drug treatment facility does not have a duty to protect the general public from its discharged residents and such a duty cannot be created by such a statement of intent.

Plaintiff also offers the expert opinion of a psychiatrist, who asserts that defendant deviated from the applicable standard of care by releasing Velentzas, failing to conduct a proper clinical assessment of Velentzas prior to his discharge to determine his risk to others, and allowing the police to merely escort Velentzas off the premises without advising them of the need to detain him or transfer him to a facility with "a higher level of residential care and containment."

However, the cases offered by plaintiff and those cited by the majority in support of holding defendant liable are inapposite, and the psychiatric opinion offered by plaintiff is neither applicable nor relevant in this context.

> "In the ordinary circumstance, common law in the State of New York does not impose a duty to control the conduct of third persons to prevent them from causing injury to others; liability for the negligent acts of third persons generally arises when the de-

fendant has authority to control the actions of such third persons" (*Purdy v Public Adm'r of County of Westchester*, 72 NY2d 1, 8 [1988]).

The Court held in *Purdy* that the defendant, a health-related residential facility, could not be liable to an individual who was injured when struck by a car driven by a resident of the facility who was prone to fainting spells and blackouts and whose crash was caused by a blackout. The Court observed that the patient was a voluntary resident who was entitled to leave the facility unaccompanied; there was no statute or rule that gave the facility the authority to prevent her from leaving the premises or to control her conduct while she was off the premises so as to prohibit or prevent her from operating a motor vehicle, even knowing or having reason to know that because of her medical condition, she might black out at the wheel.

In *Eiseman v State of New York* (70 NY2d 175, 183 [1987]), where the claimants were the victims of a released former prison inmate, it was undisputed that the former inmate's release could not form the basis for a claim of negligence by the State, since his release from prison was required by law. The only issue was whether the failure by the prison physician to include the former inmate's medical and psychiatric history on a college admission medical form constituted grounds for liability on the part of the State. In dismissing that claim, the Court expressed particular concern with the potential for "limitless liability to an indeterminate class of persons conceivably injured by any negligence in that act" (*id.* at 188). It concluded that "the physician plainly owed a duty of care to his patient and to persons he knew or reasonably should have known were relying on him for this service to his patient. The physician did not, however, undertake a duty to the community at large" (*id.*).

A number of cases acknowledge the existence of a rule that a duty to control others may arise where " '[the] relationship between the defendant and the person who threatens the harm to the third person may be such as to require the defendant to attempt to control the other's conduct' " (*Pulka v Edelman*, 40 NY2d 781, 783 [1976], quoting Harper & Kime, *The Duty to Control the Conduct of Another*, 43 Yale LJ 886, 887-888 [1934]; *see D'Amico v Christie*, 71 NY2d 76, 85 [1987]). Importantly, however, as the Court pointed out in *D'Amico*, that duty to control the conduct of a third person, even where applicable, may be imposed only where the defendant has the opportunity

to control that person, that is, while the third person is on its premises (*id*.).

That is why, in *D'Amico*, the Court explained that while there may be liability for injuries caused by an intoxicated guest that occur on a defendant's property or in an area under a defendant's control, where the defendant had the opportunity to supervise the intoxicated guest, a non-commercial host who fails to prevent a picnic participant from driving away after consuming a large number of alcoholic beverages will not be held liable for the damage caused by the intoxicated driver (*id.* at 85-86). Similarly, in *Henry v Vann*, a companion case to *D'Amico v Christie*, where the plaintiffs' decedents died as a result of a collision with an automobile driven by an intoxicated individual shortly after his employer fired him and ordered him off the work site in that condition, the Court of Appeals dismissed the claim against the employer, because the employer owed no duty to the users of the public highway, and did not assume a duty of supervision or control when it directed the intoxicated employee to leave the premises (71 NY2d at 87).

In *Avins v Federation Empl. & Guidance Serv., Inc.* (67 AD3d 505 [1st Dept 2009]), this Court held that the defendant could not be held liable for a vicious knife attack against a 10-month-old infant committed by an individual with a history of mental illness who resided in an apartment operated by the defendant to provide housing and support services to individuals with a history of mental illness. We explained that while the defendant might owe a duty to other residents of its facility to protect them from foreseeable violent conduct of a resident, such duty would not extend to members of the community at large (*id.* at 507, citing *Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 233 [2001], and *Waters v New York City Hous. Auth.*, 69 NY2d 225, 228-231 [1987]).

Despite the foregoing limitations on the duty of establishments to protect the general public from dangerous people who had previously been within their confines, plaintiff, and the majority, impose on defendant a duty to ensure that when Velentzas left its premises, he remained in involuntary custody.

But, defendant's facility was entitled to discharge Velentzas; indeed, a violent incident required his discharge. Defendant's program is not a prison; from the notice provided to defendant's program by Queens TASC, it even appears that a participant can decide to leave against clinical advice. Indeed, defendant's incident report stated that Velentzas said he was

leaving against clinical advice. The program's responsibilities do not include a duty to ensure that the general public is protected from any residents who are discharged or who leave against clinical advice.

The cases relied on by the majority do not support the imposition of a duty owed to the general public under these circumstances. For instance, *Ramsammy v City of New York* (216 AD2d 234 [1st Dept 1995], *lv dismissed in part, denied in part* 87 NY2d 894 [1995]) illustrates the absence of a duty owed to the general public. There, a security guard woke an intoxicated driver sleeping in a car, and directed him to drive away although the guard knew the driver was intoxicated; the driver then struck and killed a pedestrian. The action was dismissed against the security company, based on the lack of a duty. The only claim that was allowed to proceed in *Ramsammy* was against the property owner, on the ground that it created a pedestrian mall that experts had assessed as unsafe.

As to *Fox v Marshall* (88 AD3d 131 [2d Dept 2011]), its ruling does not support the imposition on defendant of a duty to protect the general public. In *Fox*, a heinous murder was committed by a mentally ill resident of a mental health care facility while he was temporarily released pursuant to a temporary pass issued by facility staff; the Second Department relied on the liberal pleading requirements of CPLR 3211 to hold that although the resident's confinement was voluntary, his need for a pass to be allowed out—unlike the patient in *Purdy*, he apparently was not free to come and go as he pleased—provided sufficient support to avoid dismissal of a cause of action in negligence against the operator of the mental health facility for letting the resident out (*id.* at 137-138). Here, however, we are not judging the allegations of the complaint alone. We are presented with a summary judgment motion; in the face of defendant's showing that it violated no applicable duty, plaintiff was required to present any evidence that would establish such a violation of duty. Plaintiff offered no such showing.

Plaintiff's submission of an affirmation by a psychiatric expert claiming failure to abide by the required standard of care, in effect, relies on case law concerning medical malpractice claims against mental health facilities for decisions to allow the release of patients without a proper assessment of the danger they posed (*see e.g. Laura I.M. v Hillside Children's Ctr.*, 45 AD3d 260 [1st Dept 2007]). However, the duty owed by a medical facility to exercise professional judgment regarding

its patients' physical or psychiatric illnesses does not apply to defendant, a facility that provides substance abusers with counseling and the opportunity for drug-free living. The duty owed by medical professionals has no applicability here.

Finally, even assuming that defendant facility had some duty to protect the public from a discharged resident, or at least from this particular discharged resident, any such duty was extinguished when he was turned over to the police. More than that, the facility had neither the right nor the obligation to do.

In my view, defendant is therefore entitled to summary judgment dismissing the complaint.

GONZALEZ, P.J., RENWICK and FEINMAN, JJ., concur with SWEENY, J.; SAXE, J., dissents.

Order, Supreme Court, Bronx County, entered February 25, 2014, affirmed, without costs.